# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **APRIL MARIE WALKER, STEPHEN WALKER, and JAMES WALKER, individually and on behalf of FRANK AARON WALKER, Deceased**<br><br>      **Plaintiffs,**<br><br>Versus<br><br>**MOTOROLA MOBILITY, LLC; MOTOROLA SOLUTIONS, INC. f/k/a MOTOROLA, INC.; MOTOROLA, INC.; HMD GLOBAL OY; ZTE CORPORATION f/k/a ZHONGXING TELECOMMUNICATION EQUIPMENT CORPORATION; AT&T MOBILITY LLC; CRICKET WIRELESS LLC f/k/a CRICKET COMMUNICATIONS, LLC; CELLULAR TELECOMMUNICATIONS AND INTERNET ASSOCIATION f/k/a CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION a/k/a CTIA, INC. a/k/a CTIA-THE WIRELESS ASSOCIATION; and TELECOMMUNICATIONS INDUSTRY ASSOCIATION a/k/a TIA**<br><br>      **Defendants.** | **Civil Action No.:** _____<br><br><br>**JUDGE:** _____<br><br>**MAGISTRATE JUDGE:** _____ |

## COMPLAINT

COME NOW Plaintiffs, April Marie Walker, Stephen Walker and James Walker (hereinafter "Plaintiffs"), individually and on behalf of Decedent Frank Aaron Walker, and on behalf of any potential beneficiaries, for their benefit and for the benefit of all, by and through the undersigned counsel, and against Defendants, Motorola Mobility, LLC; Motorola Solutions, Inc. f/k/a/ Motorola, Inc.; Motorola, Inc.; HMD Global Oy; ZTE Corporation f/k/a/ Zhongxing Telecommunication Equipment Corporation; AT&T Mobility LLC; Cricket Wireless LLC f/k/a Cricket Communications, LLC; Cellular Telecommunications and Internet Association f/k/a Cellular Telecommunications Industry Association a/k/a CTIA, Inc. a/k/a/ CTIA-The Wireless Association; and Telecommunications Industry Association a/k/a TIA, respectfully allege the following:

### I.      PARTIES

1.

Plaintiffs, April Marie Walker, Stephen Walker and James Walker, all major persons who reside in Calcasieu Parish, Louisiana, appear both individually on their own behalf and in their representative capacity on behalf of Frank Aaron Walker, the deceased spouse of April Marie Walker and father of Stephen Walker and James Walker.

2.

Defendants herein are:

1. **MOTOROLA MOBILITY, LLC** (hereinafter referred to as "Motorola Mobility" or collectively referred to as "Motorola" with Defendants Motorola Solutions, Inc. and Motorola, Inc.) is a limited liability company organized and existing under the laws of the State of Delaware, and having its principal business office in the State of Illinois, at 222 West Merchandise Mart Place, #1800, Chicago, Illinois 60654. Motorola Mobility can be served through its agent for service of process at CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

2. **MOTOROLA SOLUTIONS, INC. f/k/a MOTOROLA, INC.** (hereinafter referred to as "Motorola Solutions" or collectively referred to as "Motorola" with Defendants Motorola Mobility and Motorola, Inc.) is a corporation organized and existing under the laws of the State of Delaware, and having its principal business office in the State of Illinois, at 500 West Monroe Street, Chicago, Illinois 60661. Motorola Solutions can be served through its agent for service of process at CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

3. **MOTOROLA, INC.** (hereinafter collectively referred to as "Motorola" with Defendants Motorola Mobility and Motorola Solutions) is a corporation organized and existing under the laws of the State of Delaware, and having its principal business office in the State of Illinois at 500 West Monroe Street, Chicago, Illinois 60661. Motorola, Inc. can be served through its agent for service of process at CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

4. **HMD GLOBAL OY** (hereinafter referred to as "HMD") is a limited liability company organized and existing under the laws of the country of Finland, and having its headquarters at Bertel Jungin aukio 9, 02600, Espoo, Finland which can be served through the Hague Convention.

5. **ZTE CORPORATION f/k/a ZHONGXING TELECOMMUNICATION EQUIPMENT CORPORATION** (hereinafter referred to as "ZTE") is a corporation organized and existing under the laws of the country of China, and having its headquarters at 55 Hi-tech Road South, Shenzhen, Guangdong, China 518057, and a United States office at 2425 North Central Expressway, Suite 800, Richardson, Texas 75080.

6. **AT&T MOBILITY LLC** (hereinafter referred to as "AT&T Mobility") is a limited liability company organized and existing under the laws of the State of Delaware, and having its principal place of business at 1025 Lenox Park Boulevard N.E., Atlanta, Georgia 30319. AT&T Mobility can be served through its agent for service of process at CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

7. **CRICKET WIRELESS LLC f/k/a CRICKET COMMUNICATIONS LLC** (hereinafter referred to as "Cricket") is a limited liability company organized and existing under the laws of the State of Delaware, and having its principal place of business in the State of Georgia at 1025 Lenox Park Boulevard N.E., Atlanta, Georgia 30319. Cricket can be served through its agent for service of process at CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

8. **CELLULAR TELECOMMUNICATIONS AND INTERNET ASSOCIATION f/k/a CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION a/k/a CTIA, INC. a/k/a CTIA-THE WIRELESS ASSOCIATION")** (hereinafter referred to as "CTIA") is a trade association existing under the laws of the District of

Columbia, and having its principal place of business at 1400 16th Street, N.W., Suite 600, Washington, D.C. 20036.

9. **TELECOMMUNICATIONS INDUSTRY ASSOCIATION a/k/a TIA** (hereinafter referred to as "TIA") is a trade association existing under the laws of the State of Illinois, and having its principal place of business at 1320 North Courthouse Road, Suite 200, Arlington, Virginia 22201.

## II.    JURISDICTION & VENUE

3.

This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiffs and all Defendants. The amount in controversy exceeds $75,000.

4.

This Court has personal jurisdiction over Defendants, who at all relevant times were engaged in the designing, testing, manufacturing, producing, labeling, marketing, promoting, advertising, selling, supplying, packaging, inspecting, servicing, quality control and/or distributing of cell phones, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of Louisiana. Each Defendant has sufficient minimum contacts with the State of Louisiana to be sued and be required to defend here.

5.

Supplemental jurisdiction is also invoked pursuant to 28 U.S.C. § 1367 as to all matters cognizable under the Louisiana Constitution and the dialectal laws of the State of Louisiana, including Louisiana Civil Code Articles 2315, 2315.1 and 2315.2 (wrongful death and survival); Louisiana Civil Code Articles 2520 and 2545 (redhibition); Louisiana Civil Code Articles 1953 and 1958 (fraud); Louisiana Products Liability Act, Louisiana Revised Statute, § 9.2800.51 et

seq. and Louisiana Revised Statutes 51.1401 and 51:1409 (unfair trade and consumer protection).

6.

Venue is proper within this district and division pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred in this district. Furthermore, Defendants engaged in designing, testing, manufacturing, producing, labeling, marketing, promoting, advertising, selling, supplying, packaging, inspecting, servicing, quality control and/or distributing of cell phones in each of the fifty states in the United States, and specifically including Plaintiffs and Mr. Walker's state of citizenship and the state or states in which Mr. Walker used the cell phones and was treated for brain cancer.

### III.    CLAIM

7.

This is a civil action arising out of the design, development, manufacturing, assembling, marketing, sale, servicing and/or support of cell phones, the use of cell phones, and the injuries resulting therefrom.

8.

Frank Aaron Walker consistently and continuously used Defendants' cell phone products beginning in about 1995 through 2020.   In or about 1995, Frank Aaron Walker (Mr. Walker) began to use a Motorola "bag phone" cell phone which he used until approximately 1997.   In or about 1997, Mr. Walker purchased and began using a second Motorola bag phone which he used until approximately 1999. In or about 1999, Mr. Walker purchased and began using a Nokia 6110 cell phone which he used until approximately 2001. In or about 2001, Mr. Walker purchased and began using a Nokia 3210 cell phone which he used until approximately 2006. In

5

or about 2006, Mr. Walker purchased and began using a Motorola Cosmic RAZR which he used until approximately 2009. In or about 2009, Mr. Walker purchased and began using a Nokia Xpress cell phone which he used until approximately 2012.   In or about 2012, Mr. Walker purchased and began using an Alcatel Tribe Express (OT-355D) cell phone which he used until approximately 2016. In or about 2016, Mr. Walker purchased and began using a ZTE Grand X3 cell phone.

9.

Mr. Walker's purchases and/or phone use included Defendants' cell phones, connection to cell phone networks, and/or other support, including transmission services, necessary to allow Mr. Walker to communicate via his cell phones as intended.   The service providers for the cell phones Mr. Walker used included Centennial, AT&T and Cricket.

10.

Mr. Walker used the above-mentioned cell phones extensively and habitually held the cell phones in his right hand against his right ear.

11.

As a result of using these cell phones, Mr. Walker was unknowingly exposed to radio frequency energy and radiation (hereinafter referred to as "RF radiation") that caused adverse health effects to Mr. Walker.

12.

In or about January 2019, at age 47, Mr. Walker was diagnosed with a Glioblastoma and underwent extensive radiation and chemotherapy following a resection of the tumor. In or about August 2020, Mr. Walker was informed the tumor had doubled in size.

13.

As a result of his brain cancer, as well as surgery and post-surgery therapy and medications, Mr. Walker was left permanently disabled.   He lost the ability to work and to participate in family activities and personal interests. Mr. Walker, a graduate of the University of Louisiana-Monroe and Andersonville Theological Seminary, served as pastor of First Baptist Church of Carlyss. A gifted musician and science instructor, he was a bi-vocational pastor and teacher at Bethel Christian School. He also served as a music minister and a youth minister. Following his diagnosis, he spent the remainder of his life being treated for brain cancer, unable to pursue and enjoy these interests.

14.

Mr. Walker suffered extensive health issues and problems related to his brain cancer, including, without limitation, seizures, visual auras, excessive fatigue, migraines, light sensitivity, memory problems, psychological and emotional stress, anxiety, depression, a range of problems associated with oxidative pathology induced by his cell phone and trauma associated with brain surgery, among other injuries.   These adverse health effects were a direct result of radiation of his brain by RF radiation emitted from his cell phones during the normal, reasonably anticipated and intended use of those cell phones.

15.

Mr. Walker was cognizant of the fact and suffered extreme emotional distress knowing his condition would worsen and his life expectancy was significantly shortened by his illness.

16.

Mr. Walker was unable to overcome this aggressive cancer and succumbed to the illness on December 31, 2020.

17.

April Marie Walker and Frank Aaron Walker were married and lived as husband and wife for 23 years until his death.   Mr. Walker was the father of two sons, Stephen Walker and James Walker.   All of the Plaintiffs have been enormously impacted and adversely affected by the loss of Frank Aaron Walker.

## DEFENDANTS' PHONES DO NOT COMPLY WITH APPLICABLE FEDERAL REGULATION

18.

The National Environmental Policy Act of 1969 charged the Federal Communications Commission (FCC) with specific responsibility to evaluate the effect of emissions from FCC-regulated transmitters on the quality of the human environment.   The products and services manufactured by Defendants transmit RF radiation absorbed by the human body during the normal, reasonably anticipated and intended use of those products and services. The products and services marketed, sold, and supplied or supported by Defendants, therefore fall within the scope of FCC-regulated transmitters affecting the quality of the human environment as defined by the National Environmental Policy Act of 1969.

19.

The FCC, in response to the National Environmental Policy Act of 1969, elected to simply adopt already existing recommendations published by the National Council on Radiation Protection and Measurements (NCRP).   These recommendations included a limit on the specific absorption rate (SAR) of RF radiation by the human body caused by regulated devices operating within close proximity to a human body.   The NCRP recommendations adopted by the FCC thus became the FCC-imposed regulation applicable to Defendants' products and services in response to the National Environmental Policy Act of 1969.

20.

These recommendations, published by the National Council on Radiation Protection and Measurements and adopted by the Federal Communications Commission in 1996, themselves only replicated an already existing standard published 4 years earlier in 1992 by the American National Standards Institute (ANSI) and the Institute of Electrical and Electronics Engineers (IEEE), known as the ANSI/IEEE C95. 1-1992 Guidelines.

21.

The specific absorption rate or SAR is a measure of the amount of RF radiation absorbed by the human body.   In the instance of the regulation by the FCC of Defendants' products and services, SAR is intended to provide a measure of the relative amount of RF radiation absorbed in the head of a user of a cell phone.   The maximum SAR level first adopted by the FCC on August 1, 1996, set a limit for exposure to RF radiation of 1.6 watts per kilogram (1.6 W/kg). The 1992 ANSI/IEEE guideline adopted by the FCC in 1996, establishing a limit on RF radiation to be transmitted by a cell phone and thus allowed to be absorbed by the human body, has remained unchanged since that time, some 30 years later.

22.

Defendants are required to ensure their phones comply with these objective limits. To be sold legally, a cell phone in the United States must test at or below these SAR levels.

23.

SAR testing is generally performed on a biological model (called a "phantom") which becomes the target for the RF radiation absorbed and thus the measured electromagnetic signal. A cell phone antenna is placed near the phantom and an electromagnetic signal is directed

toward the phantom.   Measurements are then made of the electromagnetic fields and the RF radiation absorbed by the phantom through the use of a probe inserted into the phantom.

24.

SAR testing and the results of the testing can be easily manipulated.   Changing the distance between the cell phone antenna and the phantom allows test results to be altered and thus manipulated.

25.

The liquid or medium used in the phantom to absorb RF radiation and then allow a SAR measurement is also variable and can be either a semi-liquid or a gel material. There are no mandated quality assurance protocols for the liquid or medium in the phantom or for SAR testing in general, once again leaving the integrity and reliability of this aspect of testing largely to the discretion of Defendants. For example, the liquid or medium in the phantom can develop air pockets and become contaminated, inhibiting the ability of the magnetic field to reach the probe in the phantom. The end effect is an improperly reduced and invalid measure of the actual SAR value.

26.

Because Defendants are allowed to and have agreed to have control over the SAR testing and certification of their products, Defendants are, in turn, responsible for actual compliance with the FCC regulation regardless of published testing results or certifications potentially obtained by Defendants.   Defendants are, therefore, necessarily answerable for any noncompliance with the established SAR limitation of a maximum of 1.6 watts per kilogram (1.6 W/kg) in the actual performance of their products.

27.

Defendants' testing, both before and after the introduction of cell phones in 1986, revealed that cell phones could not pass SAR safety standards.   Defendants ignored these safety standards, arguing the nature of electromagnetic energy prevented radiation from entering the brain.   Although relatively inexpensive design changes could have been made to reduce or eliminate the penetration of RF radiation into the brain of the user, Defendants nevertheless elected to produce the cell phones without addressing the RF radiation problem.

28.

Defendants are aware the liquid or medium used in the phantom does not accurately reflect the actual anatomy of the human head and that an accurate model would show levels of concentrated energy in the brain which are greater than ten times the overall average medium.

29.

CTIA is complicit in the events surrounding SAR testing of Defendants' products, including the purposeful dissemination of misinformation to citizen consumers using Defendants' products and services.   For example, CTIA's statements that there are "strict emissions guidelines" and a "rigorous review process" for testing SAR levels in cell phones are false and misleading.   CTIA was aware SAR testing results can be off by 60 percent or more.

30.

The problems triggered by and associated with SAR testing have continued.   Even as of October 2019, a year-long study, published by the *Chicago Tribune*, oversaw laboratory testing of several Apple, Samsung and Motorola cell phone models revealing non-compliance with the FCC SAR safety standard.   For example, "radiofrequency radiation exposure from the iPhone 7 – one of the most popular smartphones ever sold – measured over the legal safety limit [for

11

radiofrequency radiation absorption by the body (SAR)] and more than double what Apple reported to federal regulators from its own testing."

31.

Defendants have been and are well aware of the purposeful error in SAR testing and have manipulated these variables to report SAR values below actual values, recognizing actual values exceed the 1996 SAR limits established by the FCC.

32.

Although Defendants have an obligation to ensure the safety of cell phones before releasing the product for sale to the public, Defendants deliberately ignored and minimized known health risks in an attempt to create the facade that cell phones are not only safe, but operated well within the SAR standards. In fact, Defendants' own researchers found the measured radiation levels from cell phones exceed the guidelines and standards and should be considered dangerous.

33.

Defendants have continuously failed to comply with the 1996 SAR standards mandated by the FCC.   Plaintiffs specifically allege the phones used by Frank Aaron Walker failed to comply with the FCC SAR standard and would generate RF radiation in excess of the SAR readings suggested by certifications obtained by Defendants and the standard set by the 1992 ANSI/IEEE guidelines and 1996 FCC regulation.

34.

Accordingly, the products and services marketed, produced and supplied by Defendants fail to comply with applicable governmental regulations such that the products and services are not legally marketed, produced and supplied, and Defendants are therefore legally answerable and liable for all consequences triggered or caused by their non-compliance.

**DEFENDANTS' CELL PHONE PRODUCTS AND
RELATED SERVICES POSE A SERIOUS PUBLIC HEALTH HAZARD**

35.

Cellular communication is achieved by transmission of packeted information, voice or data, over waveforms that travel back and forth between the cell phone and base station antennas which, in turn, integrate with the larger communications infrastructure. Two modes of transmission waves are used by cellular systems, analog and digital. The carrier wave frequencies used for the first through the fourth generations of cell phone transmissions in the United States, are in the 825-845 MHz range for analog signaling and in the 1900 MHz range for digital transmissions.

36.

In all cases, information packeting is achieved through modulation, a mixing of two or more waveforms to produce a specific signal that can be transmitted, under power, by one device or antenna and received by another device or antenna at a distant location. Analog signals are frequency modulated while digital signals are modulated by time intervals or specific binary codes.

37.

As the modulated waveform moves through space, it produces a secondary waveform which oscillates in part of the electromagnetic spectrum known as the extremely low frequency

(ELF) spectrum. The combination, in both time and space, of carrier and modulated waveforms is necessary to carry information from a transmission unit to a receiver unit and vice versa.

38.

This combined construct, called the "information carrying radio wave" or ICRW, is polarized, meaning it is charged and therefore biologically active.   To prevent interference to and from other users of the cellular system, a control unit instructs the cell phones within its range to increase or decrease transmitting power further altering the traveling waveform.

39.

The power density of RF radiation from a cell phone is approximately two billion times greater than that of background fields that occur naturally in the environment.   When the cell phone is used next to the head, the RF radiation penetrates two and one-half inches or more into the brain and a portion of the brain is enveloped in RF radiation from the front to the back of the skull. The emission characteristic that causes exposure in this area of the brain is called "the near-field plume." The power density of the near-field plume determines depth of penetration into the brain exponentially.

40.

The polarized waveforms attendant to cellular transmission and reception are bioactive, absorptive and able to penetrate deep into proximate tissue.   The risk of biological effects is exacerbated by the convergence of waveforms caused by reflection and refraction off of the irregular surfaces of the human head.

41.

As has been confirmed by multiple studies, as set forth more particularly herein, cell phone emissions are biologically active, rendering them dangerous and posing significant health

14

risks, especially with prolonged or significant use. These bioeffects occur through both direct and indirect mechanisms and include damage to DNA and intracellular organelles, interference with intercellular communication, nervous system dysfunction, disruption of physiological compensation systems, and ultimately development of brain tumors and cancer.

**DEFENDANTS CONSPIRED TO SUPPRESS, MISREPRESENT AND CONCEAL MATERIAL FACTS & FAILED TO WARN CITIZEN CONSUMERS CAUSING DEFENDANTS TO BE LIABLE FOR THE CONSEQUNCES**

42.

As a direct consequence of their purposeful business relationship, the cell phone manufacturers and cell phone service providers and their trade associations, CTIA and TIA, operate as joint venturers in the cell phone market.

The cell phone market operates in a classic oligopolistic fashion with almost all cell phones purchased directly from service provider companies or through one of their agents.   Cell phone service and cell phones are sold as a package wherein the price of the cell phone is fixed below cost in order to discourage any cell phone manufacturers from trying to sell directly to consumers.   Agents are given a rebate to cover the below-cost sale of the cell phone. This tying arrangement gives cell phone companies, together with their trade associations, CTIA and TIA, de facto control over the cell phone equipment market and the power to accept or reject cell phones that do not meet their specification.   This market power was acknowledged in a July 24, 2001, article in the *San Diego Union Tribune*, where a Motorola representative is quoted as saying "cell phones manufacturers compete on style, on brand, on their relationship with wireless operators."

43.

This control over the cell phone market is further enforced by CTIA's testing program that grants the manufacturer the right to place CTIA's seal of approval on the approved cell phone.   At all times herein mentioned, Defendants were in control of the design, assembly, platform for usage, manufacture, marketing and sale of cell phones.

44.

TIA worked with the manufacturers to create and develop the technical standards implemented by the cell phone industry while CTIA was primarily responsible to make public commentary as a result of CTIA's coordinated efforts with TIA.

45.

The development of digital cellular standards was initially the responsibility of TIA, with TIA having the responsibility of developing voluntary industry standards for telecommunications products, including cell phones.   Within TIA, more than 1,000 individuals, representatives from cell phone manufacturers, as well as service providers, (including Defendants herein) serve on the formulating groups involved in standards setting.   TIA's website states its industry members can directly influence the development of technical standards by participating in TIA's standards formulating groups.

46.

Following the 1987 FCC declaration that allowed cellular licensees to employ alternative technologies in the 800 MHz band, the cell phone manufacturers and cell phone service providers acting through CTIA and TIA, have continued to direct and effect the development of technology standards.

47.

In 1988, CTIA was established to work with the cellular service operators and researchers to identify new technology requirements and set goals. CTIA was to introduce new products and services by 1991, with a 1,000 percent increase in system capacity with both AMPS (analog) and digital capabilities during transmission and new data features such as facsimile and messaging services.

48.

In 1991, based on the requirements CTIA had recommended, TIA adopted a new standard which was released with the creation of the first digital signal in the United States (Time Division Multiple Access - TDMA).

49.

CTIA and TIA continued to collaborate with respect to the cell phone industry and formed the CTIA Joint Review Committee which was created for the purpose of providing input and oversight to the cell phone industry's activities regarding the safety of cell phones, as well as to monitor research regarding related health effects in a single coordinated program.

50.

At all times herein mentioned, Defendants were aware of numerous studies and experiments that demonstrated the health hazards of RF radiation dating back to the late 1940s and continuing to this day, yet Defendants have consistently maintained to the public at large that cell phones are absolutely safe.

51.

Scientific and medical research, published in peer-reviewed literature, has demonstrated a correlation between biological effects and the exposure to RF radiation within the radio frequency band of 300 megahertz to 2.4 gigahertz.   However, scientific and medical research published in peer-reviewed literature is not typically read by the general public and cannot be deemed as placing the average consumer on notice.

52.

As research and studies, including animal research, evolved over the ensuing decades, it was found that, among other things, adverse biological effects result from exposure to RF radiation.   By the early 1960s, the scientific and medical communities knew RF radiation is absorbed into human tissue and is capable of producing biological effects.

53.

Much of the research funding concerning RF radiation is controlled or directed by the cell phone industry.   In instances where there have been adverse findings, Defendants have worked to prevent funding to replicate that study.   This is part of Defendants' larger effort to "create and control the science" and introduce confounders or redirect researchers.

54.

In the early 1990s, as credible concerns continued to surface regarding the safety of cell phones, Defendants, individually and through their trade associations, CTIA and TIA, undertook with public fanfare to fund scientific studies to prove the safety of cell phones.   This resulted in the formation of the Science Advisory Group (SAG) in 1993.

55.

With a $25 million budget, which was later increased to $28.5 million through CTIA and TIA member contributions, Dr. George Carlo was appointed by CTIA and TIA to direct the workings of SAG.   When this industry-funded research failed to corroborate the industry's claims of safety and, in fact, presented new evidence supporting health concerns, the industry responded by terminating the research funding and publicly disparaging Dr. Carlo as well as suppressing and minimizing the results of his studies.

56.

Despite their knowledge of contrary literature and research, including industry-funded studies, Defendants continued to maintain cell phones pose no threat to human health.

57.

Defendants conspired to alter the results of studies to make them more "market friendly" and acted to conceal and suppress information.   Researchers who discovered adverse effects associated with cell phone use lost their funding, were fired, found their reputation damaged, and had their work denigrated.   Motorola researchers, for example, concealed from the public the enhancement effects of antennas which caused antennas to deposit RF radiation into brain tissue.

58.

Defendants, acting collectively, reached a common agreement or understanding to market their dangerous and defective cell phones by:

    (a)    marketing, producing and promoting the use of cell phones without proper tests or warnings and without regard to the dangerous radiation fields emitted therefrom and without disclosing the adverse health effects as a result therefrom to Mr. Walker and other users;

19

(b)      suppressing, discouraging and/or retarding appropriate research, testing, regulation and public dissemination of information concerning the radiation fields and the effects those emissions would have on Mr. Walker and other users;

(c)      ignoring, deceiving or misleading the public about medical and scientific data available to them which indicated RF radiation emitted from cell phones is potentially hazardous to the health and safety of the public in general and Mr. Walker; and

(d)      suppressing and preventing the development of protective devices and measures which were available and would reduce or eliminate the risk of RF radiation to the cell phone user without good cause and instead to avoid potential liability for not having deployed such features.

59.

At all times relevant to this action, Defendants, jointly and in conspiracy with each other, knowingly committed acts in furtherance of their agreement to promote and market cell phones while disregarding known risks to the public health generally and Mr. Walker specifically.

60.

The actions undertaken jointly by Defendants extended to entities responsible for certain standards such as ANSI.

61.

ANSI adopted a set of RF radiation exposure levels determined to be safe for humans. The ANSI standard was initially developed during the 1960s, modified in 1982, and modified again in the 1990s.   In 1985, the FCC adopted the 1982 ANSI standard but excluded cell phones. Cell phones introduced in 1986 could not meet the standard established in 1982.

62.

The cell phone industry manipulated the research and pressured members of the ANSI Safety Committee to exempt cell phones from regulation and compliance under the ANSI Safety Standards.   During a 1989 meeting of the ANSI Committee held in Tucson, Arizona, the cell

phone industry representatives dominated the membership of the standard-setting committee. After a heated discussion, the committee initially voted to include cell phones under the ANSI Safety Standard. However, a short time later, at a secretly-held committee meeting attended by a select, smaller group of members, the committee voted to exclude cell phones from regulation.

63.

In 1992, the ANSI standard was revised to include, for the first time, specific restrictions on time currents induced in the human body by RF radiation fields.   Cell phones were again excluded provided they comply with certain SAR limits.

64.

On February 11, 1993, the TIA Ad Hoc Labeling Committee, in cooperation with SAG, was established to review product labeling information provided to consumers in order to develop consistent, uniform product labeling information.   The Ad Hoc Committee drafted a manual to discuss "responsible cell phone use." TIA printed for public distribution a stand-alone educational brochure to provide information about cell phones called "Guidelines for Safe and Efficient Use of Hand-Held Portable Cellular Telephones." The document was prepared for manufacturers to incorporate into their official product documentation as well as service providers that chose to provide information to subscribers.   It was also intended to form the basis for any consumer education programs about cell phones the manufacturers chose to initiate.

65.

In or about early 1994, after receiving a draft of the TIA Ad Hoc Committee's manual, Thomas Wheeler, CTIA president, sent a memorandum expressing his concerns over certain language used in the manual which acknowledged and/or implied cell phone use could pose

health risks.   For example, Mr. Wheeler proposed the following language be deleted from the manual:

> Do not operate your transportable cellular telephone when holding the antenna, or when any person is within 4 inches (10 centimeters) of the antenna.   ~~Otherwise, you may impair call quality, may cause your phone to operate at a higher power level than is necessary, and may expose that person to RF energy in excess of the levels established by the updated ANSI Standard~~.
>
> ~~If you want to limit RF exposure even further, you may choose to control the duration of your calls or maintain a distance from the antenna of more than 4 inches (10 centimeters)~~.
>
> For best call quality, keep the antenna free from obstructions and point it straight up.

66.

Although it failed to address the health concerns regarding wireless communication instruments, in November 1994, SAG endorsed TIA's efforts to develop a manual.   SAG recommended CTIA explore the possibility of incorporating the FDA's Talk Paper "Update on Cellular Phones" in the package insert to complement the usage guidelines.   SAG further recommended the industry develop an independent structure for cell phone manufacturers to have their products tested to assure they meet current safety standards.

67.

On July 16, 1993, in furtherance of its campaign to assure the consuming public of the purported safety of cell phones, CTIA held a press conference and issued a report entitled "Safety Update – Fast Facts: Portable Cell Phone Safety," which in bold print stated: **"Rest assured.   Cellular telephones are safe!"**

68.

On July 19, 1993, Elizabeth Jacobson, FDA's Deputy Director for Science for the Center

for Devices and Radiological Health, sent correspondence to CTIA president Thomas Wheeler,

identifying certain fraudulent and deceitful statements made by Defendants to the public

regarding the "safety" of cell phones.   In pertinent part, the letter states:

> I am writing to let you know that we were concerned about two
> important aspects of your press conference on July 16 concerning
> the safety of cellular phones, and to ask that you carefully consider
> the following comments when you make future statements to the
> press.
>
> First, both the written press statements and your verbal comments
> during the conference seemed to display an unwarranted
> confidence that these products will be found to be absolutely safe.
> In fact, the unremittingly upbeat tone of the press packet strongly
> implies that there can be no hazard, leading the reader to wonder
> why any further research would be needed at all.   (Some readers
> might also wonder how impartial the research can be when its
> stated goal is "a determination to reassure consumers."   And when
> the research sponsors predict in advance that "we expect the new
> research to reach the same conclusions, that the cellular phones are
> safe.") ...
>
> We are even more concerned that your press statements did not
> accurately characterize the relationship between CTIA and the
> FDA...   [S]ince it is not yet clear whether we will help to direct
> the research program, it is premature to state that we will credential
> the research.
>
> To sum up, Mr. Wheeler, our role as a public health agency is to
> protect health and safety, not to "reassure consumers."   I think it is
> very important that the public understand where we stand in
> evaluating the possibility that cellular phones might pose a health
> risk.

69.

In June 1994, Dr. Henry Lai of the University of Washington contacted Dr. Carlo at a

Bioelectromagnetics Society conference in Copenhagen, Denmark.   Dr. Lai wanted to show

important data to Dr. Carlo.   Dr. Lai and his colleague, Dr. Narendra Singh, had conducted a

series of experiments on rats that had been exposed to radiation similar to the type of radiation

emitted from the antenna of a cell phone.   Dr. Lai found cell phone radiation causes damage to

DNA.

70.

Representatives at the meeting from Motorola, Chuck Eger and Dr. Quirino Balsano,

questioned the testing protocols as well as the relevancy of the Lai and Singh experiments to

humans and dismissed the research and results.   CTIA and the remaining Defendants thereafter

failed to disclose anything about the alarming Lai and Singh data to the public or to the

government's Interagency Working Group on Cell Phone Safety headed by the FDA, the

Environmental Protection Agency, the National Institute of Health, the Occupational Safety and

Health Administration, the National Institute of Occupational Safety and Health, the White

House or the National Institute for Environmental Health Sciences.   Instead, CTIA responded to

this study by attempting to prevent its publication and hiring a public relations firm to discredit

the findings.   Defendants then funded other researchers in an effort to disprove the findings.

However, when Defendants' research confirmed the findings of Drs. Lai and Singh—that RF

radiation could damage DNA—Defendants refused to publish the research.

71.

Nonetheless, Dr. Jerry L. Phillips essentially replicated the DNA damage studies of Lai

and Singh, reaching the same conclusions, *i.e.*, exposure to low levels of RF radiation causes

DNA damage which can develop into cancer.   Defendants suppressed information from the

Phillips study by pressuring Dr. Phillips and threatening to withdraw funding. When Dr. Phillips

expressed his desire to publish his research, Motorola told Dr. Phillips it was too early and more

research was needed.   When Dr. Phillips refused to allow Motorola to "spin" his research, Motorola cut Dr. Phillips' funding and threatened to discredit him in the scientific community.

72.

In 1996, a study of Air Force personnel exposed to RF radiation in their jobs revealed an increased risk of brain tumors 1.39 times higher in those exposed versus those not exposed. Also in 1996, a study of Polish military workers exposed to radio waves in their work again revealed a statistically significant increase in the risk of brain cancer, 1.9 times higher when compared to unexposed workers.   Finally, Dr. Ross Adey, in a research project funded by Motorola and conducted at the Veteran's Administration Medical Center, again showed a biological effect from cell phone radiation. Yet, the industry did not amend its public position that RF radiation emitted from cell phones is biologically inactive and safe and instead hid or suppressed this critical research.

73.

During the summer of 1996, the relationship between CTIA, TIA and SAG (now known as the WTR – Wireless Technology Research) became strained.   Dr. Carlo had begun to pursue leads and studies potentially detrimental to the position asserted by CTIA and TIA and cell phone manufacturers and service providers. In response, CTIA and TIA reduced the funding to the WTR.

74.

In early 1998, Dr. Kjell Hansson Mild, from the Swedish National Institute for Working Life, along with colleagues from Norway, reported increased cell phone use (analog and digital) associated with a correspondingly profound increase in the prevalence of headaches, fatigue, and a sensation of warmth around the ear. In both the Swedish and Norwegian data, a statistically

25

significant increase in the prevalence of symptoms was noted that corresponded to an increase in both the number of calls made per day and the total minutes on either type of phone.   The authors cited leakage in the blood brain barrier as a possible mechanism causing the symptoms. Again, the industry ignored this data and refused to amend its public position that RF radiation emitted from cell phones is biologically inactive and safe.

75.

By the end of December 1998, the industry faced evidence of genetic damage in human blood.   Drs. Ray Tice and Graham Hook of the Integrated Laboratory Systems in Research Triangle Park, North Carolina, had preliminary results from a series of DNA damage studies. Their study demonstrated radiation from an analog signal yielded a nearly 300 percent increase in genetic damage (micronuclei development) in human blood cells.   These results were replicated in January 1999.

76.

The correlation between the presence of micronuclei and cancer is so strong that doctors from around the world are using tests for the presence of micronuclei to identify patients who are likely to develop cancer.   In fact, after the 1986 nuclear disaster at Chernobyl, Ukraine, experts used the micronuclei testing as a tool for diagnosing cancer risks.   Despite evidence that cell phone use causes genetic damage, the industry did not amend its public position that cell phone emissions are biologically inactive and safe.

77.

Also, in 1998, Dr. Joshua Muscat of the American Health Foundation completed a study, under WTR contract, of brain cancer patients.   The Muscat study reported two findings: (1) in areas of the skull where radiation plumes from cell phones penetrate, a significant increase in the

risk of tumors appeared evident; and (2) for areas of the brain where cell phone radiation is now

known not to penetrate, cell phone usage does not seem to affect the risk of tumor development.

78.

Finally, in December 1998, the WTR received a summary from Drs. Ken Rothman and

Nancy Dreyer of the Epidemiology Resources Inc. that concluded the rate of brain-cancer deaths

was higher among users of hand-held cell phones where the antenna was next to their heads as

compared to car phone users where the antenna is far away from the head of the user.

79.

After leading the cell phone industry's research effort regarding health hazards associated

with cell phone use for a period of six years, Dr. Carlo reported cell phones may very well pose

health risks to users.   The cell phone industry cut Dr. Carlo's funding and worked to discredit

him within the scientific community.   Defendants attempted to suppress Dr. Carlo's findings by

threats and acts of intimidation made upon Dr. Carlo, a notable public health scientist,

epidemiologist, lawyer, founder of Health Risk Management Group, and the individual

appointed by the cell phone industry to study the health hazards associated with cell phone use.

80.

Dr. Carlo, widely considered an industry insider, declared without prior approval from or

notice to the cell phone industry, his research established a correlation between cancer and cell

phone use.   In fact, Dr. Carlo's research indicated cell phone radiation could triple the number

of chromosomal abnormalities in human blood.

81.

In 1999, at CTIA's "Wireless '99" trade show, Dr. Carlo presented his findings to the cell

phone industry.   In response to Dr. Carlo's findings, William Collins, chairman of MetroCall,

whose 120 nationwide locations sold cell phones, established new procedures for his stores: any

customer walking in the store receives a single-page health and safety bulletin explaining the

possible dangers of using a cell phone, particularly warning parents not to expose their children

to health risks from cell phone radiation.

82.

After receiving Dr. Carlo's results in 1999, CTIA and other Defendants criticized the

study's procedures and methods and began a campaign to discredit the work and abilities of Dr.

Carlo, the man chosen to spearhead their research.

83.

On October 8, 1999, Thomas Wheeler personally sent Dr. Carlo a letter outlining CTIA's

position that all test results demonstrate the safety of cell phones.

84.

In November 1999, Dr. Carlo released a book titled *Cell Phones, Invisible Hazards in the*

*Wireless Age*. In his book, Dr. Carlo describes in detail his time at WTR, the research and

methodology used by him, and the impediments and hurdles imposed by the cell phone industry

to that research.

85.

In anticipation of Dr. Carlo's book, CTIA and Mr. Wheeler continued the media

campaign against Dr. Carlo.   In October 1999, when it became evident ABC News would air a

story about cell phone health risks, CTIA, through its lawyers, sent a letter to ABC News listing

a number of the cell phone industry's concerns.   Through the letter, CTIA also took the

opportunity to attack Dr. Carlo's credibility and question his motives for speaking out about the

health risks he had discovered.   The letter ended with a request that the airing of the 20/20

segment be delayed.

86.

When ABC News did not delay its 20/20 segment, Mr. Wheeler took the opportunity to

speak to the public:

> Our industry has gone out and aggressively asked the question,
> "Can we find a problem?" And the answer that has come back is
> that there is nothing that has come up in the research that suggests
> that there is a linkage between the use of a wireless phone and
> health effects...

ABC News 20/20, October 20, 1999.   Later in the interview, when asked about the scientific

evidence discussed above, Mr. Wheeler inexplicably stated, "I have to look at what the responsible

scientists say. . . and they say that there is not a public-health effect."

87.

These statements were false and misleading. By October 20, 1999, CTIA and other

Defendants were aware of the many studies demonstrating a statistical correlation between cell

phone use and adverse health effects.

88.

An epidemiological study released in 2000, conducted by Dr. Lennart Hardell of the

Department of Oncology at Orebro Medical Center in Orebro, Sweden, found the risk of tumors

developing on the same side of the head cell phone users hold their cell phones is significantly

higher than it is for the other side.   Despite such findings, CTIA and the other Defendants

continued to maintain cell phone radiation was biologically inactive.

89.

On August 1 and 2, 2000, Dr. Joseph Roti of the Washington University in St. Louis, Missouri, presented his findings confirming the prior WTR studies.   Using different methods and systems, his research also showed human blood cells exposed to radiation at cell phone frequencies did indeed develop genetic mutations in the form of micronuclei.

90.

Thereafter, the World Health Organization initiated a decade long multinational research project in 2000 called the Interphone Study.   The Interphone Study consisted of 14 individual epidemiological studies focusing on cell phones and brain tumors.   Participating countries included Australia, Canada, Denmark, Finland, France, Germany, Israel, Italy, Japan, New Zealand, Norway, Sweden, and the United Kingdom.   The study found the use of cell phones for a period of 10 years or more can increase the risk of glioblastomas by 40% in adults.   The study further indicated tumors are most likely to occur on the side of the head most used for calling.

91.

In the Summer of 2000, CNN's *Larry King Live* aired a story on cell phones and their health risks.   Motorola declined an invitation and instead sent a written statement: "Over the years, scientific expert panels, standard-setting organizations, and other authoritative bodies around the world have not wavered from the longstanding conclusions that the low-power radio signals from wireless phones pose no known health risk."   This statement was false and misleading. Motorola was at all times privy to the scientific studies discussed above.

92.

On February 4 and 5, 2002, ABC News (WJLA) aired a story on its I-Team segment regarding its investigation of cell phone safety.   Robert Kane, formerly a senior research

scientist and member of Motorola's technical staff, stated, "[T]here are individuals who are employed in the cell phone industry who are lying to us."

93.

Separately, numerous patents for cell phone safety devices have been obtained by Defendants, yet were never placed into the market place. These safety devices are designed to shield radiation from the head or redirect radiation away from the head. None of the Defendants has placed its cell phone safety devices on the market, leaving them essentially patented secrets held by the industry.

94.

Defendants' prior knowledge of these solutions included, but was not limited to, the following:

(a)   On October 24, 1991, Hitachi received a patent to reduce the cell phone user's exposure to RF radiation "to prevent the health of the user from being injured."

(b)   On August 11, 1992, Mitsubishi was issued a patent for a cordless telephone designed to "reduce the effect of an electromagnetic wave onto a head of a human body" by coating the handset with shielding material on the side closest to the user's head.

(c)   On December 26, 1995, Motorola filed a patent application for an antenna with an electromagnetic shield which results in "little to no radiation directed toward the body of the user."

(d)   On February 20, 1996, Alcatel N.V. was granted a patent "for protecting a portion of the human body of a user of the transmitter against the radiation from said internal radiating system."

(e)   On April 9, 1996, a patent issued to Kevin and Norval Luxon for a shield apparatus which utilizes electromagnetic radiation absorbing materials "disposed about the antenna and portable wireless transmitting apparatus and between the user and the antenna and transmitting apparatus to shield or protect the user from the potentially harmful radiation emissions from the wireless communication apparatus."

31

(f)     On June 4, 1996, Ericsson received a patent for an output power controller to assure "the average RF-exposure levels from . . . cellular hand-held radio telephones do not exceed a predetermined level."

(g)     On August 13, 1996, Catholic University received a patent for the "protection of living systems from adverse effects of electric, magnetic and electromagnetic fields."   The application for the patent states "extensive experimental evidence has shown that exposure to ELF electromagnetic fields can lead to changes in biological cell function.   Similar effects have been demonstrated from exposure to modulated microwaves and RF signals.   Since ALL (cell phones) transmit modulated microwave or RF signals the potential induction of bio-effects through the use of these devices is evident."

(h)     On September 25, 1997, Motorola submitted a patent application and was subsequently granted a patent whereby "a high magnetic permeability/low reluctance material is incorporated into an antenna to limit radiation, where radiation is not desired."

(i)     On July 28, 1998, Nokia received a patent for a shielding layer between the antenna and the user to reduce the electromagnetic irradiation of the user.   The application says the cell phone antenna is a "few centimeters from the brain, the hearing organs, and the organ of equilibrium.   Although a direct heating effect could be left without further consideration, it has been suggested that modulated RF radiation induces changes in the electrical status, *i.e*., in the ion balance of nerve cells.   A continuous localized exposure to radio frequency irradiation has been suggested to weaken myelin sheath of cells and to eventually lead to an impairment of hearing capability, vertigo, etc.   It has been suggested that radio frequency irradiation may stimulate extra growth among supportive cells in the nerve system, which in the worst case it has been suggested could [lead] to a development of malignant tumor, *e.g*., glioma form supportive cells."

(j)     On December 29, 1998, Nokia received a patent for an accessory RF unit which "decreases radiation directed towards the user's head."

(k)     On November 16, 1999, Ericsson received a patent for an antenna switch to prevent cell phones from being used unless the antenna is fully extended.   The patent application states if the antenna is not fully extended "the antenna will be in undesirably close proximity to the user's head, thereby increasing the user's specific absorption rate (SAR) of electromagnetic energy emitted from the antenna."

(l)     On January 25, 2000, Nokia received a patent for a cell phone alarm system so that the user may "reduce to a minimum the SAR value and the quantity of radiation directed at his head or body by employing the correct appliance position and situations and by adjusting the transmission time."

(m)     On February 29, 2000, Centurion International received a patent for an antenna to "tailor the radiation characteristics of the antenna in such a way as to decrease the specific absorption rates (SAR) to the user of the" cell phone.   The patent application states "questions have arisen concerning the possibility of harmful effects of electromagnetic energy on the human body inasmuch as handheld radios, cell phones and other portable wireless communication devices do emit electromagnetic energy.   Many studies have been conducted to closely examine the effects of electromagnetic energy on the human body to determine a safe level of exposure and how to accurately measure the level.   In conjunction with this, there have been some attempts to move the source of electromagnetic energy away from the body by means of the antenna location or design."

(n)     On February 6, 2006, Samsung Electronics received a patent radio frequency identification card whereby, "A radio frequency identification (RFID) reader is provided, having a transmitting circuit that generates a transmitted signal to operate an RFID tag, a receiving circuit that receives a received signal including a tag signal from the RFID tag and a transmission carrier leakage signal leaking from the transmitting circuit, and a leakage removing circuit that senses a phase and amplitude of the transmission carrier leakage signal inputted to the receiving circuit, converts the transmitted signal from the transmitting circuit into a signal having a phase opposite to that of the transmission carrier leakage signal and an amplitude equal to that of the transmission carrier leakage signal, and synthesizes the converted signal and the received signal inputted to the receiving circuit."

95.

Defendants continued to deny the existence of any debate concerning the safety of cell phones.   In 2002, Motorola director of global strategic issues, Norman Sandler, told *Wireless NewsFactor*: "Reports of these [mobile phone radiation shield] patents misrepresented their nature and intent . . . none of these Motorola patents was [sic] motivated by any health-related concerns or issues."   Sandler continued by saying the patents were related to making the company's products more "efficient," and not with warding off alleged harmful energy.   No explanation was provided as to why patents for efficiency were never used.

96.

The United Kingdom's Department of Trade and Industry (DTI) released a report in May 2002 on mobile phone radiation shields.   Four different types of RF radiation shields were tested: shielded cases, earpiece pads and shields, antenna clips and caps, and absorbing buttons. The report concluded the shields can reduce the maximum SAR from the handset, but can also reduce the effectiveness of the phone.

97.

In 2002, Jack Rodger, the owner of Global Certification Laboratories who tested the efficacy of radiation shields for three years, reported the radiation shields "all do pretty much the same thing" and, while some of the shields differ slightly, most are blocking about the same amount of energy.

98.

In August 2002, a report was issued from Stockholm, Sweden, regarding a study that showed the risk of developing brain tumors from first-generation cell phones (Nordic Mobile

Telephone, NMT) was as much as 80% greater than those who did not use cell phones.   Nokia produced two models of its cell phone that operated on the NMT standard until approximately 2005.

99.

In September 2002, CTIA continued to deny the possible risks cell phones may pose to human health.   In response to the 2002 Swedish study, CTIA spokeswoman Jo-Ann Basile released the following statement:

> Public health officials look at all the science when they make their assessments.   And the judgment of public health agencies and scientific bodies around the world – as they look at science to date – is that there are no adverse health effects from cell phones.

100.

A study conducted in 2002 by an Italian cell biologist, Fiorenzo Marinelli of the National Research Council in Bologna, Italy, found cell phones may cause tumors to grow more aggressively.

101.

In 2002, David de Pomerai, a British molecular toxicologist of the University of Nottingham, found evidence that cell phone radiation may have biological effects without warming tissues.   Research conducted by Dariusz Leszczynski at the Radiation and Nuclear Safety Authority in Helsinki has corroborated de Pomerai's findings.

102.

A Swedish study published in January 2003 in the peer-reviewed *Environmental Health Perspectives* (EHP), a journal of the National Institute of Environmental Health Sciences, part of the U.S. Department of Health and Human Services, found electromagnetic fields (EMFs) emitted by certain cell phones damaged neurons in the brains of rats.

35

103.

A four-year study conducted by Reflex and funded by the European Union, with its findings released in December 2004, examined the effects of radiation from cell phones on animal and human cells in a laboratory.   The study found radio waves from cell phones damage DNA and other cells in the body and that the damage extended to the next generation of cells. Mutated cells are considered a possible cause of cancer.   The radiation used in the study was at SAR levels of between 0.3 and 2 W/kg.   Most cell phones emit radio signals at SAR levels of between 0.5 and 1 W/kg.

104.

The Reflex report recommended that children limit their use of cell phones to emergency situations.   Additionally, Franz Adlkofer, who led the Reflex study, advised people to use landlines, rather than cell phones, wherever possible.

105.

The Mobile Operators Association (MOA), established in January 2003 to represent the five United Kingdom cell phone network operators (3, O2, Orange, T-Mobile and Vodafone) on radio frequency health and planning issues, released the following statement to BBC News on December 21, 2004, in response to the Reflex study results:

> Independent scientific review bodies in the UK and around the world have consistently concluded that the weight of scientific evidence to date suggests that exposure to radiowaves from mobile phone handsets and base stations operating within international guidelines do not cause adverse health effects.

106.

In January 2005, the National Radiological Protection Board (NRPB), an independent research organization in the UK, announced parents should not let children under the age of eight

36

use cell phones.   NRPB explained evidence of the potentially harmful effects of cell phone use has become more persuasive over the past five years.

107.

In May 2005, a study published in the *British Medical Journal* reported using a cell phone in rural areas might lead to the development of brain tumors.   The study found residents of Swedish rural areas who had been using a cell phone for more than three years were more than three times as likely to be diagnosed with a brain tumor as those living in Swedish urban areas. The risk of a brain tumor quadrupled for more than five years of rural area use and, for malignant brain tumors, the risk was eight times as high for those living in rural areas. Since base stations are further apart in rural areas and require a higher signal intensity to compensate, there is a difference in the power output and a greater risk between cell phones in urban and rural areas.

108.

In 2009, the *Journal of Clinical Oncology* published a meta-analysis that found evidence linking cell phone use to tumors.   The paper analyzed 465 scholarly studies that had conducted experiments concerning cell phone radiation and cancer.   After combining all of the data from these studies, the meta-analysis demonstrated a significant positive association between cell phone use and cancer.   The meta-analysis also established the association increased with long-term cell phone use.

109.

The United States Senate Subcommittee on Labor, Health and Human Services and Education Committee on Appropriations held a hearing on September 14, 2009, to discuss the issue of cell phones and health.   Dr. Siegal Sadetzki, the principal investigator for the Israeli portion of the Interphone Study, discussed the country-specific results from Israel, which were

37

published in the *American Journal of Epidemiology*. Related to cell phone use and RF exposure to the side of the head, an elevated risk of salivary gland tumors was seen among people who used cell phones for more than 10 years, especially when the phone was usually held on the same side of the head where the tumor was found, and when use was relatively heavy.   These studies found a higher risk with greater exposure (as expressed by laterality of use, more frequent use, and longer duration of use), consistent with basic public health research criteria for what is referred to as a dose response relationship – the greater the dose or use of cell phones, the greater the risk of developing a tumor.

110.

Dr. Sadetzki warned that given the great number of users, together with the increasing amount of use, even if the risks are small, these risks could eventually result in considerable damage. She explained simple and low-cost measures can be taken to minimize RF radiation exposure from cell phones, such as using speakers and earphones, reducing the use of cell phones in areas where reception is weak, and limiting cell phone use by children.

111.

In addition to brain cancer and the salivary gland tumors discussed by Dr. Sadetzki, studies show RF radiation exposure can increase the risk of lung cancer, acoustic neuroma (benign tumor on the auditory nerve), leukemia and lymphoma. Dr. Sadetzki also noted that in addition to cancer, cell phone use could have other medical impacts, such as influence on brain activity, behavioral changes, learning patterns, emotional well-being, immunological pathways and fertility, which have yet to be completely studied.

112.

On May 17, 2010, CNN's *Larry King Live* aired a story on cell phones and their health

risks.   According to the transcript, Samsung Electronics, Motorola, Nokia and Sony Ericksson

declined an invitation to appear on the program.   Instead, the companies let CTIA speak on their

behalf.   CTIA provided a statement which read, "All cell phones sold in the United States must

comply with the FCC's radio frequency exposure standards, which are designed to include a

substantial margin of safety for consumers. Numerous experts and government health and safety

organizations around the world have reviewed the existing database of studies and on-going

research and concluded that RF products meeting established guidelines pose no known health

risk."

113.

CTIA's website has a separate "For the Consumer" area on its website.   In the sub-area

discussing health issues, CTIA's website in 2002 stated:

> After a substantial amount of research, scientists and governments
> around the world continue to reaffirm that there is no public health
> threat from the use of wireless phones.' stated Tom Wheeler,
> President and CEO of the Cellular Telecommunications Industry
> Association (CTIA).

114.

The statement that there is "no public health threat from the use of wireless phones" was

modified on CTIA's website in 2005 to read: "To date, the available scientific evidence does not

show any health problems are associated with using wireless phones."

115.

CTIA claims the industry is subject to strict guidelines regarding safety.   In 2005, the

CTIA website stated: "Wireless products are required to adhere to strict emissions guidelines,

which are themselves developed under a thorough and rigorous review process."   The United

States, the International Commission on Non-Ionizing Radiation Protection (ICNIRP) and

Canada have reviewed their guidelines and declared they "continue to protect the public."   Yet,

the only regulation is the FCC's maximum SAR levels that a cell phone can emit, and guidelines

for measuring SAR – which Defendants measure and certify to the FCC.   These guidelines are

not meant to certify the cell phones are actually safe, but rather they are meant to certify the SAR

levels do not exceed a certain level.   In response to frequently asked questions, the CTIA

website in 2005 stated:

> *What SAR level should I look for when buying a wireless phone?*
>
>> There are many features to consider when buying a wireless phone: style, size, functionality and price.   The SAR is provided for consumers who may also be interested in RF exposure levels.   It is important to remember, however, that all wireless phones marketed in the United States must meet the safety limit of 1.6 W/kg (watts per kilogram) set by the FCC and do not pose a health risk to users. The guidelines that set the safety limit incorporate a substantial margin of safety to give additional protection to wireless phone users.
>
>> ***
>
> *What is CTIA's requirement that will tell me about the radio wave levels of my phone?*
>
>> Beginning in early 2001, consumers will receive information about a phone's radio wave levels or Specific Absorption Rates (SAR) in the informational materials or user manual included with phones certified by CTIA after August 1, 2000.   This information will provide the SAR level for the phone, let consumers know that their phone model has been tested and meets strict, science-based federal guidelines and describe and put SAR into context for the consumer.   Because CTIA's certification program is voluntary not all phones will include this information . . . On the outside of the box will be information stating that the phone meets FCC RF emissions guidelines, the phone's FCC ID number (used for searching on the FCC website) and the FCC website where more information on the phone's SAR can be found.
>
>> ***

40

*What is the CTIA certification program?*

The CTIA certification program is a separate, voluntary testing program unrelated to the FCC's product certification process.   The CTIA certification program is designed to make sure that mobile 26 phones perform according to industry standards.   CTIA certified phones have passed CTIA's stringent evaluation program by meeting or exceeding the industry's expectation for performance.

CTIA modified its consumer information page to read:

To date, the available scientific evidence does not show that any health problems are associated with using wireless phones.   Many studies of low-level RF exposure, such as that which occurs with wireless devices, have not discovered any negative biological effects.   Some studies have suggested such a connection, but their findings have not been replicated or supported in additional research.

***

Scientists and the federal government have been studying the biological effects of RF for years and have thus established guidelines that restrict RF levels to a safe and usable level for technologies the general public uses in their everyday lives.

***

All wireless devices must adhere to strict emissions guidelines in the United States, which have been developed under a thorough and rigorous review process.   All wireless base station antennas and phones must meet the science-based, RF emission guidelines of the Federal Communications Commission (FCC), which has established very conservative limits to ensure that the health of all citizens is protected.   The FCC maintains a database that provides the SAR value for cellular phones sold in the United States.

116.

Not only have Defendants failed to inform consumers regarding the risks of cell phone use and disclose simple measures that may help mitigate these risks, Defendants continue their refusal to acknowledge and disclose the potential risks and harms posed by cell phones.

117.

Defendants introduced cell phones into the market without any prior oversight from any governmental agency and without testing for environmental or adverse health consequences from electric fields, magnetic fields and electromagnetic fields generated by this equipment.

118.

In 2011, the World Health Organization (WHO), through its International Agency for Research on Cancer (IARC), declared the RF radiation emitted from cell phones to be "possibly carcinogenic to humans," a "Group 2B" classification.   Thirty scientists with recognized expertise in the field of RF radiation were selected to form the IARC Working Group charged with classifying the carcinogenicity level of cell phone radiation.   The Working Group conducted an extensive review of the relevant literature and study data before reaching its conclusion, which was set forth in the IARC Monograph, published in 2013.   Specifically, the Monograph states the Working Group placed greater weight on the studies from the Swedish researcher, Lennart Hardell, finding Dr. Hardell's studies more methodologically robust than other epidemiological studies touted by the industry.

119.

Since IARC's review in 2011, more than 1,000 additional scientific studies have been published in peer-reviewed literature further supporting the causal link between cell phone radiation, brain tumors and health effects.   Several experts have analyzed this new information and concluded cell phone radiation should be classified as a "probable human carcinogen."

120.

In 2012, the Italian Supreme Court (Corte di Cassazione) issued an opinion ruling a plaintiff's brain tumor was caused by his long-term, heavy use of cell phones while on the job.

42

The Italian Supreme Court, like IARC, relied heavily on the studies by Lennart Hardell and colleagues and the Interphone Study.   The Court considered the Hardell studies to be more "reliable" and more "independent" than others which were funded by the cell phone industry.

121.

On March 5, 2015, Alexander Lerchl (Lerchl), Professor of Biology at Jacobs University in Germany, published a study which sought to replicate a 2010 study by Thomas Tillman of the Fraunhofer Institute of Toxicology and Experimental Medicine in Hannover, Germany, which found weak cell phone signals can promote the growth of tumors in mice.   Lerchl's study used radiation levels that do not cause heating and are well below current safety standards.   Lerchl also found lower doses were often more effective tumor promoters than higher levels.

122.

Prior to his 2015 study, Lerchl was well known as one of the more outspoken critics of both Drs. Hardell and Adlkofer, challenging any science that showed a causal connection between cell phone radiation and adverse health effects.   However, Lerchl's own study ultimately confirmed a causal connection exists even at low levels of radiation.

123.

In May 2016, the U.S. National Toxicology Program (NTP) announced male rats exposed to cell phone radiation developed higher rates of cancer based on its long-term study.   The same radiation that lead male rats to develop cancer also caused DNA breaks in the male rats' brains. Ron Melnick, the leader of the team that designed the NTP study, stated the NTP results provide "strong evidence for the genotoxicity of cell phone radiation," and "should put to rest the old argument that RF radiation cannot cause DNA damage."

43

124.

At all relevant times, the biological effects caused by the low-level RF radiation emitted by Defendants' cell phones was fully known and appreciated by Defendants. At all relevant times, Defendants should have, and easily could have, disclosed to Mr. Walker and the general public the existence and implications of this health risk.   Instead, Defendants lulled Mr. Walker and like consumers into a false sense of security that cell phones pose no health risks. Notwithstanding Defendants' knowledge and awareness of health risks and effects of cell phones, Defendants intentionally and knowingly misrepresented and distorted the true facts and research, concealed and omitted material facts and research, and failed to warn Mr. Walker and other consumers of health risks, effects, research and protective measures and devices.

125.

Although Defendants have an obligation to ensure the safety of cell phones before releasing the product for sale to the public, Defendants deliberately ignored known health risks in an attempt to create the façade cell phones are not only safe, but operated well within SAR standards. In fact, Defendants' own researchers found the measured radiation levels from cell phones exceeded ANSI guidelines and should be considered dangerous.

126.

Not only were Defendants aware of the mounting studies demonstrating adverse health effects caused by cell phones, Defendants were also aware of numerous solutions that could virtually eliminate such health hazards of radiation from cell phones such as shielding, antenna phasing, use of low reluctance material pattern, shrouds and canting, among others. Although Defendants could have incorporated one or more of these safety features in cell phones at a

minimal cost, Defendants simply ignored such adverse health effects and instead continued to assert to the public that cell phones are indeed safe.

127.

Defendants' strategy has been to aggressively market and sell cell phones and related services by misleading and misinforming potential users about the products and by failing to protect users from serious dangers which Defendants knew or should have known to result directly from the use of these products.

128.

CTIA and TIA have been at the forefront of the cell phone industry's bad faith and deceptive public relations program to reassure the public of the absence of risk of harm from cell phone use. A standard press release by CTIA states, "After years of substantial research, scientists and governments around the world continue to reaffirm that there is no public health threat from the use of wireless phones."   Ed Stiano, a top Motorola executive, announced at a TIA press conference, more than "forty years of research" and "more than ten thousand studies" had already shown cell phones were safe. These statements were false and misleading and made in willful and wanton disregard of the true facts known to Defendants and the right of Mr. Walker to be aware of the risks associated with the use of cell phones.

129.

Defendants widely and successfully marketed cell phones across the United States, including the State of Louisiana. Defendants undertook an advertising blitz extolling the virtues of cell phones in order to induce widespread use of the product.   Defendants' marketing campaigns consisted of advertisements on television, radio and the Internet, promotional

literature to be placed in the printed media and in other advertising media, and other promotional materials to be provided to potential users of cell phones.

130.

Defendants' advertising program, as a whole, through affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image and impression the use of cell phones was safe with no potential for harm to the user.

131.

Defendants purposefully downplayed, understated, and/or did not state the health hazards and risks associated with cell phones. Defendants, through promotional literature, deceived potential users of cell phones by relaying positive information, including testimonials from satisfied users, and by manipulating statistics to suggest widespread acceptability while downplaying, understating, and/or not stating the known adverse and serious health effects. Defendants intentionally and falsely kept relevant information from potential and actual cell phone users and minimized user concern regarding the safety of these products and services in an effort to deceive potential and actual users.

132.

Defendants concealed and withheld material information from Mr. Walker as well as other potential and actual cell phone users, including, but not limited to, the following:

    (a)    The ANSI standards for RF radiation had consistently been revised downward.

    (b)    The cell phones Mr. Walker had purchased were not in compliance with the ANSI guidelines or the FCC mandated SAR limits.

    (c)    The corresponding model cell phones provided and/or purchased and used by Mr. Walker had test SAR readings above the level set by the 1992 ANSI guidelines.

(d)     "Hot spots" within the brain are created by the reflection and refraction of the RF radiation waves off such things as the curvature of the skull, ridges in the bone and the irregular shape of the brain, which focus the energy much like a magnifying glass does on a single location and creates a SAR reading 200 times the allowable amount.

(e)     The SAR testing conducted by Defendants does not test for non-ionizing radiation or for hot spots created by the convergence of airwaves by reason of reflection and refraction off of the irregular surfaces of the human head and attenuation by passage through different layers of skin, fat, bone, etc. before reaching the brain.

(f)     When the cell phone is held at different positions against the head, it results in greatly different SAR results.   Defendants did not provide Mr. Walker, or any other potential or actual cell phone users, with any warning concerning the consequences of not maintaining the distance and angle of the phone in conformance with the SAR test procedures.

(h)     There is a wide range of individual tolerance to RF radiation as a result of differences in individuals' body cell water, fat content and other factors. This makes certain individuals more susceptible to the effects of RF radiation.

(i)     Numerous studies were known to Defendants showing cell phones cause adverse health effects to the user.

(j)     After the FCC established a maximum SAR level on August 1, 1996, it allowed cell phone manufactures to self-certify whether their cell phones are within SAR limits.

(k)     The SAR testing was subject to testing error and manipulation rendering the results thereof unreliable.

(l)     Numerous precautionary measures could have been taken to ensure the safety of the cell phones, but which Defendants failed to implement.

133.

Mr. Walker purchased and used cell phones extensively without any concerns and without undertaking any precautionary measures in reliance upon Defendants' misrepresentations and omissions as to the safety of the cell phones.

134.

Although Defendants were aware of the large number of minutes of airtime for periods used by Mr. Walker as well as other cell phone users, Defendants failed to warn Mr. Walker there was a risk of harm associated with his cell phone use or recommend he use a headset or take other precautionary measures to reduce his RF radiation exposure from cell phones.

135.

Mr. Walker relied on Defendants' statements that cell phones were safe to use in making his decision to purchase cell phones, subscribe to Defendants' cell service, and use and continue to use his cell phones extensively.   Mr. Walker would not have purchased the cell phones he used or taken the risk of extensively using cell phones without protective measures or devices had Defendants disclosed the truth about the health risks and effects of cell phones, the self-certification procedure and SAR levels, and the protective measures and devices that could have been available to Mr. Walker and other cell phone users.

136.

Mr. Walker would have taken precautionary measures had Defendants disclosed such measures were available and could significantly lessen risks of using a cell phone.

**COUNT I**
**LOUISIANA PRODUCTS LIABILITY ACT, LA. REV. STAT. § 9:2800.51, *et seq.***
**(Against All Defendants Except CTIA & TIA)**

137.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

138.

At all times relevant to this litigation, Defendants were engaged in the business of designing, testing, manufacturing, producing, labeling, marketing, promoting, advertising, selling, supplying, packaging, inspecting, servicing, quality control and/or distributing cell phones, which are defective and unreasonably dangerous to consumers, including Mr. Walker.

139.

At all times relevant to this litigation, the cell phones were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Mr. Walker, without substantial change in the condition in which they were sold.

140.

At all times relevant to this litigation, Defendants designed, tested, produced, labeled, marketed, promoted, advertised, sold, supplied, packaged, inspected, serviced, addressed quality control and/or distributed the cell phones in a defective and unreasonably dangerous condition at the time they were placed in the stream of commerce including, but not limited to:

(a) When placed in the stream of commerce, Defendants' cell phones contained manufacturing and design defects which rendered the cell phones unreasonably dangerous;

(b) The manufacturing and design defects in Defendants' cell phones occurred while the cell phones were in the sole possession and control of Defendants; and

(c) The manufacturing and design defects in Defendants' cell phones existed before they left the control of Defendants.

141.

The cell phones manufactured and/or designed by Defendants were defective in construction or composition in that, when they left Defendants' control, they deviated in a material way from applicable manufacturing performance standards including Defendants' own manufacturing standards. In particular, the cell phones are not safe, causing Mr. Walker to be exposed to deadly levels of RF radiation without knowledge of the cell phones' dangerous characteristics. The cell phones are/were unreasonably dangerous in construction and/or composition as provided by Louisiana Revised Statute § 9:200.55.

142.

The cell phones manufactured and/or designed by Defendants were defective in design in that alternative designs exist that would prevent serious side effects and severe and permanent harm. Defendants could have employed safer alternative designs to render the cell phones safe or, in the alternative, provided adequate warnings or proper instructions for use on how to limit the potential risk associated with the cell phones' defective designs. Defendants could have designed their cell phones to make them less dangerous. At the time Defendants designed the cell phones, the state of the industry's scientific knowledge was such that less risky designs were attainable. Thus, at the time the cell phones left Defendants' control, there were practical, technically feasible and safer alternative designs that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' cell phones. Defendants' cell phones are unreasonably dangerous in design as defined in Louisiana Revised Statute § 9:2800.56.

50

143.

The cell phones manufactured and/or supplied by Defendants were unreasonably

dangerous because Defendants did not provide adequate warnings about them or instructions

concerning the dangerous characteristics of cell phones. At the time the cell phones left

Defendants' control, they possessed a characteristic that may cause damage, and Defendants

failed to use reasonable care to provide an adequate warning or instructions of the dangerous

characteristics and dangers to cell phone users. Defendants' cell phones are not safe and have

serious side effects including, but not limited to, increasing the risk of brain cancer. Defendants'

cell phones are unreasonably dangerous because of inadequate warning as provided in Louisiana

Revised Statute § 9:2800.57.

144.

The cell phones manufactured and/or supplied by Defendants were unreasonably

dangerous because they did not conform to an express warranty made by Defendants regarding

the cell phones' safety and fitness for use. Defendants' express warranty regarding the cell

phones induced Mr. Walker to use the cell phones and his injury and death were proximately

caused because Defendants' express warranty was untrue. Defendants' cell phones are

unreasonably dangerous because of nonconformity to express warranty as provided by Louisiana

Revised Statute § 9:2800.58.

145.

As a direct and proximate result of Defendants' placing their defective cell phones into

the stream of commerce, Plaintiffs were injured and have sustained pecuniary loss and general

damages.

146.

Plaintiffs specifically demand general and special damages pursuant to Louisiana Revised Statute § 9:2800.51, *et seq*.

## COUNT II
## REDHIBITION, LA. CIV. CODE ART. 2520 & 2545
### (Against All Defendants Except CTIA & TIA)

147.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

148.

At all times relevant to this litigation, including the time of sale and consumption, the cell phones, when put to their intended or reasonably foreseeable and/or reasonably anticipated use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of brain cancer associated with the use of cell phones.

149.

The unreasonably dangerous nature of the cell phones creates a breach of the warranty against redhibitory defects, or vices, of things sold pursuant to Louisiana Civil Code Article 2520 which states: "A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." Further, "A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing," and is therefore "liable to the buyer" pursuant to the presumption of knowledge set forth in Louisiana Civil Code Article 2545.

150.

Defendants breached said warranties as cell phones manufactured prior to August 1,1996, were not fit for their ordinary purpose and are unreasonably dangerous and unfit for that ordinary purpose.

151.

Defendants further breached said warranties as such cell phones manufactured after August 1, 1996, failed to comply with the FCC mandated SAR level, were not fit for their ordinary, intended use and purpose, and are unreasonably dangerous and unfit.

152.

Had Mr. Walker known the use of the cell phones would have significantly increased his risk of brain cancer, he would not have used or taken the risk of extensively using cell phones without protective measures or devices. As a direct and proximate result of these redhibitory vices, Plaintiffs and Mr. Walker suffered injuries and damages as alleged herein.

153.

Due to the redhibitory vices of the cell phones, Plaintiffs specifically demand damages and attorney fees pursuant to Louisiana Civil Code Article 2520 and 2545.

**COUNT III**
**CONCEALMENT, MISREPRESENTATION & FRAUD**
**(Against All Defendants)**

154.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

155.

From the time Defendants first marketed and distributed cell phones until the present, Defendants willfully deceived Mr. Walker by concealing from him and the general public the facts concerning cell phones' risks and dangers.

156.

At all times relevant to this litigation Defendants conducted campaigns to promote cell phones and, in so doing, willfully deceived Mr. Walker and the general public as to the benefits, health risks and consequences of cell phone use.

157.

In furtherance of this scheme, Defendants made false, malicious and willful misrepresentations to Mr. Walker and other consumers and/or intentionally concealed and hid material facts from Mr. Walker and other consumers in an effort to deceive and defraud them.

158.

At all times herein, Defendants, in their advertising, public statements, instruction manuals and promotional literature, continuously made false representations to Mr. Walker and the public in order to cause them to believe cell phones are safe and do not pose any risk of harm to the user whatsoever.

159.

In order to maintain and/or increase their sales and profits, Defendants, through their advertising, promotional campaigns and marketing, have, by use of false, misleading and deceptive statements, intentionally and knowingly misrepresented the following to the public and Mr. Walker:

(a)     Cell phones are safe to use in that there is absolutely no health risk from cell phones;

(b)     Healthcare standards have been adopted by the federal government to assure the public cell phones are safe;

(c)     Research has shown there is absolutely no risk of harm associated with the use of cell phones;

(d)     Manufacturers' testing of cell phones is a guarantee the cell phone emits no harmful radiation;

(e)     All precautions and safety measures have been used to ensure the safety of cell phones;

(f)     The test results for cell phones manufactured prior to August 1, 1996, were accurate and showed cell phones to be safe; and

(g)     Cell phones manufactured after August 1, 1996, complied with the FCC mandated SAR.

160.

In order to maintain and/or increase their sales and profits, Defendants, through their advertising, promotional campaigns and marketing have intentionally and knowingly concealed and hid material facts from the public, including Mr. Walker, as follows:

(a)     There is a risk of harm from cell phone use;

(b)     Defendants failed to adequately test cell phones;

(c)     Cell phones did not meet the requisite safety standards;

(d)     Research indicated an association between cell phone usage and illness, including cancer;

(e)     Methods and solutions were available which could limit or eliminate the transmission of hazardous RF radiation into the user's body;

(f)     Protective devices and other protective measures could reduce the risk of harm upon the user;

(g)     There were procedures and methods concerning the proper and safe use of cell phones which could have been implemented;

(h)     Research and test results demonstrated cell phones posed a health risk upon the user;

(i)     Cell phones which were manufactured after August 1, 1996, operated in excess of the 1996 SAR standard; and

(j)     The SAR testing was subject to testing error and manipulation, rendering the results thereof unreliable.

161.

Defendants made the misrepresentations and omissions of material facts with full knowledge of the falsity thereof and/or with reckless disregard for the truth.

162.

Defendants intentionally made the misrepresentations and omissions in bad faith.

163.

In making these misrepresentations of facts to Mr. Walker, as well as other prospective and existing users of cell phones, while knowing such representations to be false, Defendants have intentionally misrepresented material facts and breached their duty not to do so.   Mr. Walker would not have purchased the cell phones he used or taken the risk of extensively using cell phones without protective measures or devices had Defendants disclosed the truth about the health risks and effects of cell phones, the dangers of using the cell phones, the self-certification procedure and SAR levels and the protective measures and devices that could have been available to Mr. Walker and other cell phone users.

164.

Defendants made the misrepresentations and concealed and hid material facts from Mr. Walker for the purpose of causing Mr. Walker, as well as other prospective and existing users of cell phones, to rely upon such statements and omissions to their detriment, which in fact occurred.

56

165.

Mr. Walker reasonably relied upon Defendants' misrepresentations and omissions and suffered medical expenses, financial loss, loss of earnings, and illness and death as a result thereof.

166.

As a direct, natural, foreseeable and proximate result of the foregoing, Mr. Walker suffered permanent and total disability, underwent surgery and multiple cancer treatments, and ultimately died as a result of his injuries. Prior to his death, Mr. Walker sustained economic loss, a diminution or loss of earning capacity, emotional and psychological stress and a range of adverse health problems associated with oxidative pathology induced by exposure to cell phone RF radiation in an amount to be determined. Mr. Walker and/or his Estate further incurred significant costs for health care, medical, funeral, incidental and related expenses and/or has been otherwise injured.

167.

By virtue of the intentional, malicious and bad faith conduct of Defendants, the Estate is entitled to recover damages.

168.

As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Walker suffered damages for which his Estate is entitled to recovery including, but not limited to, compensatory damages, consequential damages, interest, costs and attorney fees.

**COUNT IV**
**CIVIL CONSPIRACY & CONCERT OF ACTION**
**(All Defendants)**

169.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

170.

Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, conspired and acted in concert to cause Mr. Walker's injury and death by exposing Mr. Walker to harmful and dangerous cell phones. Defendants further knowingly agreed, contrived, combined and conspired to deprive Mr. Walker of the opportunity of informed free choice as to whether to use the cell phones and expose himself to the stated dangers. Defendants committed the wrongs as described herein by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to cell phones.

171.

In furtherance of said conspiracies, Defendants performed the following overt acts:

(a)     For many decades, Defendants, individually, jointly and in conspiracy with each other, have been in possession of scientific data, literature and test reports that clearly indicated ordinary and foreseeable use of cell phones was unreasonably dangerous, hazardous, deleterious to human health, carcinogenic and potentially deadly.

(b)     Despite the scientific data, literature and test reports possessed by and available to Defendants, Defendants individually, jointly and in conspiracy with each other, fraudulently, willfully and maliciously:

        i.   withheld, concealed and suppressed scientific information regarding the increased risk of biological effects and/or cancer from Mr. Walker, as described above;

    ii.  caused to be released, published and disseminated scientific data, literature and test reports containing information and statements regarding the risks of biological effects and/or cancer which Defendants knew were incorrect, incomplete, outdated and misleading;

    iii.  suppressed, discouraged, and/or retarded appropriate research, testing, regulation and public dissemination of information concerning the radiation fields and the effects those emissions would have on Mr. Walker and other users;

    iv.  ignored, deceived or mislead the public about medical and scientific data available to them which indicated RF radiation emitted from cell phones is potentially hazardous to the health and safety of the public and Mr. Walker;

    v.  suppressed and prevented the development of protective devices and measures which were available and would reduce or eliminate the risk of RF radiation to cell phone users for reasons of cost and potential liability and for not having deployed such features at the outset of cell phone production; and

    vi.  marketed, produced and promoted the use of cell phones without proper tests or adequate warnings and without regard to the dangerous radiation fields emitted therefrom and without disclosing the adverse health effects as a result therefrom to Mr. Walker and other users.

(c)    By these false and fraudulent representations, omissions and concealments, Defendants intended to induce and did induce Mr. Walker to rely upon these false and fraudulent representations, omissions and concealments, and to continue to expose himself to the dangers inherent in the use of and exposure to cell phones.

172.
.

Mr. Walker reasonably and in good faith relied upon the aforementioned fraudulent

representations, omissions, and concealments made by Defendants regarding the nature of cell

phones.

173.

At all relevant times, Defendants knew cell phones, cell phone marketing and webpages related to cell phones and/or cell phone safety should contain warnings about the risk of cancer, but they purposefully suppressed this information and omitted warnings. They did so to maintain sales and profits.

174.

As a direct, foreseeable and proximate result of Defendants' conspiracy and concert of action, Mr. Walker purchased and used cell phones which directly and proximately caused him to develop brain cancer and suffer the injuries and damages alleged herein.

**COUNT V**
**NEGLIGENCE**
**(CTIA & TIA Only)**

175.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

176.

At all times relevant to this litigation CTIA and TIA have been engaged as trade associations to the cell phone industry.   TIA and CTIA each work not only directly with and on behalf of its members, but also collaboratively. More particularly, CTIA has been engaged in advocating on behalf of Defendant cell phone manufacturers and service providers in connection with the establishment and/or implementation of safety standards for cell phones, researching use of cell phones, promoting, marketing, coordinating and making representations on behalf of Defendants regarding the safety and proper use of cell phones to the public. TIA, as discussed hereinabove, represents its members' interests before Congress, the Administration, agencies

such as the FCC and the Department of Commerce, international regulators, foreign governments and in many other forums.   TIA has been especially active as standards and policies have been formulated to regulate the industry.   Since 1988, TIA has advocated numerous policy issues for the benefit of its members.

177.

Defendants owed Mr. Walker the duty of ordinary and appropriate care, but failed to fulfill that duty in numerous respects including, but not limited to, the following:

(a)     by failing to disclose the health risks related to cell phone use which were already known to Defendants at the time of marketing the product;

(b)     by failing to disclose research as it became available indicating health risks related to cell phone use;

(c)     by stifling research regarding health risks related to cell phone use;

(d)     by reducing research budgets and/or denying funding to scientists who had previously obtained results indicating health risks related to cell phone use;

(e)     by assisting in the discrediting of scientists who obtained results indicating health risks related to cell phone use;

(f)     by failing to provide to the public and/or Mr. Walker adequate warnings regarding the dangerous potential hazards from cell phone use and/or proper instructions for safer use of cell phones;

(g)     by failing to disclose there were protective measures and devices available which could have eliminated and/or reduced the hazards from using cell phones;

(h)     by continuing to falsely promote the safety of cell phone use in written materials, on websites and/or during speaking engagements;

(i)     by "influencing" and/or assisting Defendant members to "influence" the development of technical standards in a manner that was detrimental to cell phone users within the public and Mr. Walker;

(j)      by assisting, supporting and/or lobbying on behalf of other Defendants in obtaining reduced and/or lower governmental standards in connection with cell phones that were detrimental to cell phone users within the public and Mr. Walker;

(k)      by assisting in the marketing, promotion and selling of cell phones without adequate safeguards to protect cell phone users, including Mr. Walker; and

(l)      by further assisting in and promoting a false sense of security in the public and Mr. Walker by creating a CTIA testing program/CTIA seal of approval program for manufacturers' cell phones.

178.

All the while CTIA and TIA assisted the cell phone industry in establishing purported safety standards while establishing their organizations as the public relations arm to reassure the public "cell phones are safe."   TIA worked with the manufacturers to create and develop the technical standards implemented by the cell phone industry while CTIA was primarily responsible to make public commentary based on its coordinated efforts with TIA.

179.

As a direct, natural, proximate and foreseeable consequence of the foregoing, Mr. Walker suffered damages for which his Estate is entitled to recovery, including, but not limited to, compensatory damages, consequential damages, interest, costs and attorney fees.

**COUNT VI**
**UNFAIR AND DECEPTIVE TRADE PRACTICES,**
**LA. REV. STAT. § 51:1401, *et seq.***
**(Against All Defendants Except CTIA & TIA)**

180.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

181.

The Louisiana Unfair Trade Practices and Consumer Act, Louisiana Revised Statute § 51:1401, *et seq.*, authorizes Plaintiffs to bring a cause to recover for injury or loss sustained as a result of improper trade or unfair methods of competition and deceptive practices as prohibited by Section 51:1401 of the Louisiana Unfair Trade Practices and Consumer Protection Law.

182.

Defendants violated the Louisiana Unfair Trade Practices and Consumer Act, Louisiana Revised Statute § 1401, *et seq.*, by engaging in unfair and/or deceptive practices, which Defendants had knowledge and which were not known to Mr. Walker, including the use of fraud, false representations, suppression and omission of material facts as set forth in this complaint, with the intent that consumers, like Mr. Walker, reasonably rely upon such concealment, suppression and/or omission of material fact.

183.

By virtue of the foregoing, Defendants made affirmative misrepresentations and/or omitted information that was material to Mr. Walker's decision about whether to purchase his cell phones or the proper and safest manner of using the cell phones.   Such information was known to Defendants and was not known by Mr. Walker.   Mr. Walker would not have purchased the cell phones he used or taken the risk of extensively using and continuing to use such cell phones without protective measures or devices had Defendants disclosed the truth about the health risks and effects of cell phones, the dangers of using the cell phones purchased by Mr. Walker, the self-certification procedure and SAR levels, and the protective measures and devices that could have been available to Mr. Walker and other cell phone users.

184.

The actions of Defendants violate Louisiana Revised Statute § 51:1405, which prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

185.

Because of the unfair and deceptive practices knowingly used by Defendants, Plaintiffs specifically demand treble damages pursuant to Louisiana Revised Statute § 51:1409.

## COUNT VII
## WRONGFUL DEATH, LA. CIV. CODE ART. 2315.2
## (All Defendants)

186.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

187.

As a direct and proximate result of the acts and/or omissions of Defendants as set forth herein, Mr. Walker used cell phones for approximately twenty-five years. Subsequent to such use, Mr. Walker developed brain cancer, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

188.

The conduct described herein was caused by the wrongful acts, neglect, carelessness, fault, fraud and misconduct by Defendants and their agents and servants.

189.

As a direct and proximate result of Defendants' conduct and omissions described herein, the cell phones Mr. Walker used caused his injuries and damages as described with particularity herein.

64

190.

Plaintiffs seek damages for the fair monetary value of Mr. Walker's life including, but not limited to, compensation for loss of wages, services, protection, care, assistance, society, consortium, companionship, comfort, guidance, counsel and advice of Mr. Walker and for emotional suffering as a result of the loss of Mr. Walker. Plaintiffs also seek recovery for the reasonable funeral and burial expenses of Mr. Walker and any and all other available relief.

191.

As a direct and proximate result of Defendants' conduct, Plaintiffs and Mr. Walker have been injured and sustained severe and permanent damages.

192.

Plaintiffs specifically demand general and special damages pursuant to Louisiana Civil Code Article. 2315.2.

## COUNT VIII
## SURVIVAL ACT, LA. CIV. CODE ART. 2315.1
### (All Defendants)

193.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

194.

Plaintiffs sue individually and in favor of the legal representatives, beneficiaries and Estate of Mr. Walker pursuant to the Survival Act and seek all damages provided by that statute and available under each cause of action resulting from the injuries sustained by Mr. Walker, Plaintiffs and any beneficiaries.

195.

Plaintiffs seek damages for pain and suffering, consciousness of impending death, lost earnings, medical bills and any other available relief.

196.

As a direct and proximate result of Defendants' conduct and omissions described above, the cell phones Mr. Walker used caused the injuries and damages alleged herein

197.

Plaintiffs specifically demand general and special damages pursuant to Louisiana Code Article 2315.1.

**COUNT IX**
**LOSS OF CONSORTIUM AND LOSS OF LOVE AND AFFECTION**

198.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

199.

April Marie Walker was the spouse of Frank Aaron Walker at the time he first began exhibiting symptoms and was diagnosed with a brain tumor, and continued to be his spouse.

200.

Stephen Walker and James Walker were the sons of Frank Aaron Walker at the time he first began exhibiting symptoms and was diagnosed with a brain tumor.

201.

By reason of the injuries and medical condition suffered and sustained by Mr. Walker, and as a direct, natural, proximate and foreseeable result thereof, April Walker has been deprived of her husband's comfort, society and companionship, and such deprivation to the general damage of April Walker.   Defendants are therefore jointly and severally liable to April Walker for general damages in an amount to be assessed.

202.

By reason of the injuries and medical condition suffered and sustained by Mr. Walker, and as a direct, natural, proximate and foreseeable result thereof, Stephen Walker and James Walker have been deprived of their father's comfort, society and companionship, and such deprivation to the general damage of Stephen Walker and James Walker.   Defendants are therefore jointly and severally liable to Stephen Walker and James Walker for general damages in an amount to be assessed.

## COUNT X
## PUNITIVE DAMAGES

203.

Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

204.

The conduct of Defendants in designing, testing and manufacturing, and Defendants' conduct in producing, labeling, marketing, promoting, advertising, selling, supplying, packaging, inspecting, servicing, addressing quality control and distributing their cell phones and in failing to warn Plaintiff and other members of the public of the dangers inherent in the use of

cell phones, which were well known to Defendants, was attended by circumstances of fraud, malice, or willful and wanton conduct, done heedlessly and recklessly, without regard to consequence, or of the rights and safety of others, particularly Mr. Walker.   Such conduct includes but is not limited to the following:

(a)  Upon information and belief, Defendants actually knew of their cell phones' defective nature, as set forth herein, but continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of the health and safety of the consuming public, including Mr. Walker, and in conscious disregard of the foreseeable harm caused by their cell phones;

(b)  Upon information and belief, Defendants failed to conduct adequate post-marketing surveillance of this product;

(c)  Defendants continued to promote the safety of cell phones and failed to provide adequate warnings regarding the risk of malfunction of the product; and

(d)  Upon information and belief, Defendants had knowledge of safer alternative designs for its product and failed to substitute such a safer design.

205.

Plaintiffs seek judgment against Defendants, jointly and severally, as in doing the actions herein alleged, Defendants acted with oppression, fraud, and malice and Plaintiffs are therefore entitled to punitive damages in an amount reasonably related to Plaintiffs' actual damages, and to Defendants' wealth, and sufficiently large to be an example to others and to deter Defendants and others from engaging in similar conduct in the future.

ACCORDINGLY, Plaintiffs, April Marie Walker, Stephen Walker and James Walker, individually on their own behalf and in their representative capacity on behalf of Frank Aaron Walker, pray that, after due proceedings, judgment be rendered in their favor in the manner and in the form set forth in this complaint and for such other relief or remedies as may be proper under the evidence and the law presented.

Respectfully submitted,

**LUNDY, LUNDY, SOILEAU & SOUTH, LLP**

 **/s/ Hunter W. Lundy**
**HUNTER W, LUNDY (#8938)**
**MATTHEW E. LUNDY (#18988)**
**RUDIE R. SOILEAU, JR. (#2119)**
P.O. Box 3010
Lake Charles, LA 70602-3010
Tel: 337-439-0707
Fax: 337-439-1029
hlundy@lundylawllp.com
mlundy@lundylawllp.com
rudiesoileau@gmail.com

Of Counsel:

**Robert F. Kennedy, Jr. (#1999994)**
Attorney at Law
2185 Mandeville Canyon Rd
Los Angeles, CA 90049
Tel: (323) 532-1116

*Attorneys for Plaintiffs*