# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | |
|---|---|
| **APRIL MARIE WALKER ET AL** | **CASE NO.  2:21-CV-00923** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **MOTOROLA MOBILITY L L C ET AL** | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the Court is a Rule 12(b)(6) Motion to Dismiss (Doc. 67) filed by Defendants Motorola Mobility, LLC; Motorola Solutions, Inc. f/k/a/ Motorola, Inc.; Motorola, Inc.; Microsoft Mobile, Inc.; HMD Global Oy; AT&T Mobility LLC; Cricket Wireless LLC f/k/a Cricket Communications, LLC; and Cellular Telecommunications and Internet Association f/k/a Cellular Telecommunications Industry Association a/k/a CTIA, Inc. a/k/a/ CTIA-The Wireless Association, wherein Defendants assert Plaintiffs' claims are preempted by federal law. Plaintiffs oppose the motion. Doc. 98. Defendants have replied. Doc. 107.

## I.    BACKGROUND

### A.  Factual Background

This diversity action arises from Frank Aaron Walker's terminal brain cancer, allegedly caused by his use of Defendants' cell phone products between 1995 and 2020. Doc. 25, pp. 5–7. Plaintiffs, who are Walker's surviving spouse and sons, assert that the radiation emitted by defendants' phones exceeded the limit on the Specific Absorption Rate

("SAR") for RF radiation adopted by the Federal Communications Commission ("FCC"). *Id.* at 7–9, 12.

Count I is a claim under the Louisiana Products Liability Act, Louisiana Revised Statutes section 9:2800.51, *et seq.*, against all Defendants except CTIA and TIA (which are trade associations rather than manufacturers). Doc. 25, pp. 47–50. Plaintiffs allege that the phones used by Mr. Walker were defective in construction or composition because, when they left Defendants' control, they deviated in a material way from applicable manufacturing performance standards, including defendants' own manufacturing standards, and defendants did not provide adequate warning concerning the dangerous characteristics. *Id.*

As to Count II, Plaintiffs allege that Defendants, except for CTIA and TIA, failed to contain adequate and proper warnings in violation of Louisiana Civil Code articles 2520 and 2545. Doc. 25, p. 50–52.

In Count III, Plaintiffs allege that all Defendants are liable for concealment, fraud, and misrepresentation for willfully deceiving Mr. Walker about the cell phones' risks and dangers. *Id.* at 52–56.

Count IV raises a claim of civil conspiracy and concert of action against all defendants. *Id.* at 56–58. Plaintiffs allege that they conspired to (1) cause Mr. Walker's death by exposing him to harmful and dangerous cell phones and (2) deprive Mr. Walker of "informed free choice" regarding cell phone use by concealing its dangers. *Id.*

In Count V, plaintiffs bring a claim of negligence against Defendants CTIA and TIA only. *Id.* at 58–60. They allege that CTIA and TIA concealed information regarding the

risks of cell phone use from the public while assisting the cell phone industry in establishing "purported safety standards" and reassuring the public that cell phone use was safe. *Id.* at 60.

Count VI alleges that Defendants, except CTIA and TIA, violated the Louisiana Unfair and Deceptive Trade Practices Act ("LUTPA"), Louisiana Revised Statutes sections 51:1401, *et. seq.*, through "fraud, false representations, [and] suppression and omission of material facts as set forth in this complaint" regarding the safety of their products. *Id.* at 60–62.

Count VII is a wrongful death claim against all defendants under Louisiana Civil Code article 2315.2. *Id.* at 62–63.

Count VIII is a survival action against all defendants under Louisiana Civil Code article 2315.1. *Id.* at 63–64.

Count IX is a claim against all Defendants for loss of consortium and loss of love and affection. *Id.* at 64–65.

Lastly, Count X is a general claim for punitive damages against all Defendants based on allegations of fraud, malice, or willful or wanton conduct. *Id.* at 65–66. Defendants maintain that all of the above claims are barred under the doctrine of implied conflict preemption, based on the obstacle they pose to the FCC's regulation of cell phone radiofrequency emissions. Doc. 67.

## B. Statutory Background

Congress established the FCC in 1934 with the passage of the Federal Communications Act of 1934 ("FCA"), granting the agency broad authority[1] to regulate radio communications to fulfill its "purpose of regulating interstate and foreign commerce in communication by wire and radio . . . ."[2] 47 U.S.C. § 151. Congress also included a saving clause in the FCA that manifests its intent to preserve remedies "existing at common law or by statute" and indicates FCA provisions "are in addition to such remedies" existing under state law.[3] Under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–35, which requires agencies to account for actions "significantly affecting the quality of the human environment," the FCC assumed responsibility for addressing safety concerns raised by radiofrequency ("RF") emissions. 100 F.C.C.2d 543, ¶ 1 (1985). In 1985, after notice and comment, the FCC adopted the 1982 American National Standards Institute Committee's ("ANSI") guidelines for human exposure to RF electromagnetic radiation. *Id.* at 552. These guidelines would only "initially apply" to certain "broadcast facilities," certain "satellite-earth stations," and certain "experimental facilities." *Id.* at 561–62.

---

[1] "The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." 47 U.S.C. § 154(i).

[2] "For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter." 47 U.S.C. § 151.

[3] "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414.

In 1993, in response to newly adopted standards by ANSI and due to its obligations under the NEPA, the FCC initiated proposed rulemaking, ET Docket 93–62, to decide whether to adopt ANSI's new standards. 8 F.C.C.R. 2849. The notice of proposed rulemaking indicated that the FCC was "proposing to adopt exclusions for low-power devices provided in the new 1992 ANSI/IEEE guidelines" but would consider that handheld telephones "must comply with the requirements specified for uncontrolled environments." *Id.* at 2851.

In February 1996, prior to a final FCC rule, Congress enacted the Telecommunications Act of 1996 ("TCA"), "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."[4] There Congress preempted state regulation of "personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv). Additionally, the TCA included a saving clause applicable to state law: "(1) NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 47 U.S.C. § 152. Finally, under the TCA Congress directed the FCC to complete rulemaking

---

[4] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified throughout 47 U.S.C. (2018)).

under the portion of its docket, 8 F.C.C.R. 2849–51, considering adoption of the revised ANSI guidelines for cell phones. Pub. L. No. 104-104, § 704(b), 110 Stat. 152 (1996).

In August 1996, after the TCA's passage, the FCC adopted a revised SAR Standard based on recommendation by the National Council on Radiation Protection and Measurements and the 1992 ANSI/IEEE guidelines. 11 F.C.C.R. 15123, 15134–35 (1996). The following year, the FCC responded to petitions, amended certain aspects of its guidelines, and issued the 1997 SAR Standard (hereinafter, "FCC SAR Standard"), which effectively reaffirmed the 1996 SAR Standard. 12 F.C.C.R. 13494 (1997). In 1997 the FCC also stated that it found "insufficient evidence at this time to warrant our preempting state and local actions that are based on concerns over RF emissions for services other than those defined by Congress as 'personal wireless services.'"[5] *Id.* at 13529. Additionally, since 1985 the FCC has maintained regarding its expertise in RF exposure that is it not a health and safety agency.[6]

The FCC reaffirmed its SAR Standard in 2019, stating that after review of the "extensive record" submitted in response to its inquiry it found "no appropriate basis for and thus decline[d] to propose amendments to our existing limits at this time." 34 F.C.C.R. 11687, 11688 (2019). The current FCC SAR Standard is set out in 47 C.F.R. § 2.1093(d).

---

[5] Under the TCA, "personal wireless services" are defined as "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services." 47 U.S.C. § 332(c)(7)(C)(i). As explained by the Third Circuit in *Farina*, infra, the provisions of the TCA relating to preemption for "personal wireless services facilities" are contained within the subsection relating to zoning authority and suggest that the statute is only directed at preempting zoning laws regarding the placement of physical infrastructure to support wireless networking, rather than cell phones. 625 F.3d 97, 118–19 (3d Cir. 2010).

[6] 89 F.C.C.2d 214, 251 (1982); 100 F.C.C.2d 543, 552 (1985); 8 F.C.C.R. 2849, 2850 (1993); 11 F.C.C.R. 15123, 15134–35 (1996); 12 F.C.C.R. 13494, 13505 (1997); 28 F.C.C.R. 3498, 3501 (2013); 34 F.C.C.R. 11687, 11758 (2019).

Mobile devices must comply with the FCC SAR Standard and be certified by the FCC prior to being sold in the United States. 47 C.F.R. §§ 24.50–52, 2.803. Accordingly, the agency has promulgated regulations requiring cell phone manufacturers to perform routine evaluation of their devices and to demonstrate compliance with the SAR Standard. 47 C.F.R. §§ 2.1091, 2.1093. Within these requirements the agency provides:

> Evaluation of compliance with the SAR limits can be demonstrated by either laboratory measurement techniques or by computational modeling. The latter must be supported by adequate documentation showing that the numerical method as implemented in the computational software has been fully validated; in addition, the equipment under test and exposure conditions must be modeled according to protocols established by FCC–accepted numerical computation standards or available FCC procedures for the specific computational method. Guidance regarding SAR measurement techniques can be found in the Office of Engineering and Technology (OET) Laboratory Division Knowledge Database (KDB). The staff guidance provided in the KDB does not necessarily represent the only acceptable methods for measuring RF exposure or RF emissions, and is not binding on the Commission or any interested party.

47 C.F.R. § 2.1093(d)(2).

## II.  <u>LEGAL STANDARD</u>

Rule 12(b)(6) allows for dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." When reviewing such a motion, the court should focus on the complaint and its attachments. *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). The Court can also consider documents referenced in and central to a party's claims only if plaintiffs do not object. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Courts "may also consider matters of which [it] may take judicial notice." *Hall v. Hodgkins*, 305 Fed. App'x 224, 227 (5th Cir. 2008) (internal citation omitted) (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir.1996) (unpublished opinion)).

Such motions are reviewed with the court "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). However, "the plaintiff must plead enough facts 'to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, the court's task is not to evaluate the plaintiff's likelihood of success but instead to determine whether the claim is both legally cognizable and plausible. *Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### III. LAW & ANALYSIS

#### A. General Preemption Standards

Federal preemption of state law come from the United States Constitution's Supremacy Clause, which declares federal law to "be the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. And "[u]nder this federalist system, 'the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause.'" *Wyeth v. Levine*, 555 U.S. 555, 584 (2009) (quoting *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)). Both state statutes and common law tort claims are subject to federal preemption. *See Riegel v. Medtronic*, Inc., 552 U.S. 312, 323–26 (2008).

The Supreme Court has identified two "cornerstones" of preemption jurisprudence: (1) "the purpose of Congress is the ultimate touchstone in every pre-emption case" and (2) the court begins "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (collecting cases) (cleaned up); *see also Aldridge v.*

*Mississippi Dep't of Corr.*, 990 F.3d 868, 875 (5th Cir. 2021). The second cornerstone is known as the presumption against preemption "because respect for the States as 'independent sovereigns in our federal system' leads us to assume that "Congress does not cavalierly pre-empt state-law causes of action.'" *Wyeth*, 555 U.S. at 565 n. 3 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Moreover, "[t]here is no federal preemption *in vacuo*, without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (internal quotations omitted) (quoting *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). Accordingly, "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (internal quotations omitted) (quoting *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 111(1992)). Instead, "a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Virginia Uranium*, 139 S. Ct. 1894, 1901 (2019) (quoting *Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U. S. 495, 503 (1988)).

Defendants' motion is grounded in obstacle/"purposes and objectives" preemption, a type of implied preemption. This occurs when there is "a state law that 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law." *E.g.*, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The Court has repeatedly held

within this jurisprudence that "state laws can be preempted by federal regulations as well as by federal statutes." *Id.*; *see, e.g.*, *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713 (1985). The presence of a saving clause will also not bar the operation of implied preemption. *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000). However, a state law must conflict with a "significant objective of a federal regulation" before preemption is warranted. *Williamson*, 562 U.S. at 326. Factors relevant to determining whether something is a "significant objective," including "examination of the regulation, including its history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the regulation's pre-emptive effect." *Id.* at 330; *see also Geier*, 529 U.S. at 877–81. Courts, however, should not defer "to an agency's *conclusion* that state law is pre-empted [because] agencies have no special authority to pronounce on pre-emption absent delegation by Congress." *Wyeth*, 555 U.S. at 576–77 (emphasis in original).

## B. Appellate Case Law—Conflict Preemption by the FCC SAR Standard

Several appellate courts have considered the issue of whether state law claims that either directly or indirectly impose stricter RF emissions standards than those mandated by the FCC are preempted under the doctrine of conflict preemption by standing as an obstacle to the accomplishment of the full purposes and objectives of Congress. *See Cohen v. Apple*, 46 F.4th 1012 (9th Cir. 2022); *Farina v. Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010); *Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005); *Murray v. Motorola, Inc.*, 982 A.2d 762 (D.C.A. 2009). The U.S. Courts of Appeals for the Third and Ninth Circuits as well as the District of Columbia Court of Appeals held state law claims were preempted by the FCC's adoption

of the SAR Standard, while the U.S. Court of Appeals for the Fourth Circuit found that plaintiffs' claims survived express preemption, field preemption, and conflict preemption inquiries. *Id.*

### 1. *Pinney v. Nokia (2005)*

In *Pinney*, five class actions filed in separate states were consolidated for trial in the District of Maryland. *Pinney v. Nokia, Inc.*, 402 F.3d 430, 440 (4th Cir. 2005). The plaintiffs, representing cell phone users who had not been provided with headsets when they bought or leased their phones, alleged that their phone use exposed them to dangerous RF radiation and resulting adverse health risks. *Id.* The district court concluded that the plaintiffs' claims were preempted because their cases stood as an obstacle to "Congress' objectives of achieving national uniformity in wireless telecommunications services and striking a balance between the proliferation of wireless services and the need to protect the public from any harmful effects of RF exposure." *Id.* at 457 (internal quotation omitted). "The district court relied on § 332 of the FCA to find a sweeping congressional objective of ensuring that all equipment used in connection with wireless telecommunications be subject to exclusive national RF radiation standards that have the effect of precluding state regulation on the subject." *Id.*

The Fourth Circuit disagreed, holding that the FCA and TCA provided no evidence of express preemption. *Id.* at 457–58. As to the manufacturer's obstacle preemption argument, the *Pinney* court stated: "It is difficult to understand how a headset requirement (the specific relief sought) would affect the establishment of a nationwide wireless service network or the availability of wireless service coverage. . . . While wireless telephones

access the network, they are not part of the infrastructure; accordingly, a headset requirement would not stand as an obstacle to Congress's goal of achieving nationwide coverage." *Id.* at 458. In all, the Fourth Circuit determined that the framework of the FCA and TCA indicated a strong congressional intent to retain the state law claims and held that the suits against the cell phone manufacturers could proceed. *Id.* at 458–59.

### 2. *Murray v. Motorola, Inc. (2009)*

*Murray* involved plaintiffs with brain cancer allegedly caused by cell phones manufactured by defendants. *Murray v. Motorola, Inc.*, 982 A.2d 764, 768 (D.C.A. 2009), as amended on reh'g (Dec. 10, 2009). After determining the plaintiffs' claims were not expressly preempted, the court addressed the argument that "cell phones that are sold in compliance with the current FCC rules nevertheless may be deemed unreasonably dangerous under state law, so that wireless carriers and equipment manufactures potentially may be subject to civil liability." *Id.* at 775. The court emphasized the FCC's contemporaneous explanations in the SAR Standard that "the RF radiation limits it adopted 'provide a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address growing marketplace demands.'" *Id.* at 776 (quoting 12 F.C.C.R. at 13497 (1997)). The court then concluded that a state regulation altering the balance the FCC had created in rejecting a more stringent standard would be preempted. *Id.* at 776, 780. The court gave weight to the FCC's view, including the "FCC's argument in the amicus brief that verdicts that would hold defendants liable for damages for bodily injuries caused by cell phones that met the FCC RF radiation limit 'would necessarily upset

[the] balance [the agency struck] and . . . contravene the policy judgments of the FCC' regarding how safely and efficiently to promote wireless communication." *Id.* at 777 (alterations in original).

The D.C. court reached this decision despite plaintiffs' arguments that their injuries were the results of "non-thermal" effects that the FCC intentionally omitted from its SAR Standard.[7] *Id.* at 776; *see* 12 F.C.C.R. at 13505 (1997). Furthermore, the court did not preempt certain consumer protection claims not premised on the adequacy of the FCC standards and it was "satisfied that plaintiffs have pled at least several claims about false or misleading statements or omissions that, if proven, could be violations of the [consumer protection statute], and which do not necessarily depend for their success upon proof that cell phones are unreasonably dangerous." *Id.* at 782. The D.C. court's position thus indicates that the state law tort claims were preempted only "insofar as plaintiffs' claims rest on allegations about the inadequacy of the FCC's RF radiation standard or about the safety of their FCC-certified cell phones." *Id.* at 777.

### 3. *Farina v. Nokia (2010)*

The plaintiffs in *Farina* resembled those in *Pinney*: the matter began as a class action against various cell phone manufacturers and retailers by users who alleged that their phones could not be safely operated without headsets. *Farina v. Nokia Inc.*, 625 F.3d 97,

---

[7] The court found, however, that not all plaintiffs' claims were conflict preempted:

> Assuming that plaintiffs' claims entail in part a claim that they were injured through use of cell phones manufactured before August 1, 1996, that did not meet the standard that the FCC adopted as of that date (or through the use of any other non-FCC-compliant cell phones), we discern no reason why the claims should have been dismissed on the ground of conflict preemption. Such claims—claims to which we refer more generally hereafter as "claims about non-FCC-compliant cell phones"—do not appear to challenge or to conflict with the FCC's RF standard for cell phones.

*Id.* at 782.

104 (3d Cir. 2010). Applying the "presumption against preemption," the Third Circuit rejected the defendants' express and field preemption arguments focusing on whether the "suit would erect an obstacle to the accomplishment of the objectives of Congress." Id. at 117–18, 122.

The *Farina* Court looked at Sections 151 and 332(a)(1) of the FCA as well as House and Senate Committee Reports on the TCA, from which it concluded that "the FCC was tasked not only with protecting the health and safety of the public, but also with ensuring the rapid development of an efficient and uniform network, one that provides effective and widely accessible service at a reasonable cost." *Id.* at 124–25. The court then linked the 1934 FCA's stated purpose to the FCC's proclamations in the 1997 FCC SAR Standard: "We believe our decisions provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *Id.* at 125. The *Farina* court reasoned that the FCC SAR Standard is the product of balancing "competing interests relevant to RF regulations—safety and efficiency . . . by adopting the hybrid ANSI/IEEE-NCRP set of standards, and [the FCC] has implemented [this by] requiring every cell phone sold in the United States to comply with those standards." *Id.* The Third Circuit thus held the state tort claims were preempted by the FCC SAR Standard because "[a] jury determination that cell phones in compliance with the FCC's SAR guidelines were still unreasonably dangerous would, in essence, permit a jury to second guess the FCC's conclusion on how to balance its objectives." *Id.* at 125, 134.

### 4. *Cohen v. Apple (2022)*

*Cohen* involved a class action suit brought by plaintiffs seeking to represent all iPhone users in the United States. *Cohen v. Apple Inc.*, 46 F.4th 1012, 1016, 1023 (9th Cir. 2022). Plaintiffs raised tort and consumer fraud claims under California law. Their complaint, based on third-party testing by the *Chicago Tribune*, alleged that iPhones had regularly exceeded the federal RF radiation exposure limit. *Id.* at 1023. In response to the report, the FCC conducted further testing and found no evidence of violation of its standards. *Id.* The lower court invited the FCC to participate as amicus curiae and the agency argued that "plaintiffs' claims are preempted to the extent they suggest that RF emissions from cell phones certified by the FCC for sale in the United States are unsafe." *Id.* The issues before the Ninth Circuit, however, did not extend to causes of action premised on RF radiation levels exceeding FCC SAR Standard—those claims were dismissed on summary judgment by the district court. *Id.* at 1024–25.

Assuming without deciding that the presumption against preemption applied, the Ninth Circuit held that it was "overcome because the conflict between the FCC's RF radiation regulations and plaintiffs' state law claims poses a sufficient obstacle to the full accomplishment of the FCC's objectives." *Id.* at 1029. The court adopted *Farina*'s reasoning, stating that "[t]he FCC's adoption of specific RF radiation limits for cell phones is the result of the agency's striking a balance between the conflicting policies of public safety and the public's access to telecommunications technologies." *Id.* The *Cohen* court also found that the saving clauses posed no barrier to a finding of conflict preemption, observing that giving it effect would permit state common law to interfere with the FCC's

regulatory objective of balancing "policies of public safety and the public's access to telecommunications technologies." *Id.* at 1029–30. The court added, however:

> If plaintiffs were to press the allegations in the complaint that Apple's iPhones exceeded the maximum RF radiation levels permitted by the FCC, and were to argue that the state-law remedies they seek were premised on Apple's violations of the FCC's RF radiation standards, this would be a different appeal, and the savings clause might have some force.

*Id.* at 1030.

### C. Whether FCC RF Regulations Preempt Louisiana Tort Claims

This motion asks whether Plaintiffs' tort claims under Louisiana law are preempted by the Communications Act of 1934 ("FCA") and the Telecommunications Act of 1996 ("TCA"), because they stand as an obstacle to Congress's purposes and objectives. Plaintiffs' claims are premised on the idea that a manufacturing or design defect in defendants' phones caused them to emit RF radiation above the FCC's SAR Standard. Accordingly, plaintiffs maintain that their claims pose no obstacle to the objectives emphasized in *Murray*, *Farina*, and *Cohen* because they do not impose a stricter RF emission standard. Defendants argue that plaintiffs' claims, which arise from phones certified for sale by the FCC, still attack the SAR Standard through the FCC's compliance regime and thus pose an obstacle to the agency's objectives.

Although there is no Fifth Circuit jurisprudence addressing the preemptive effect of the FCC SAR Standard, the Fifth Circuit has held that "[f]ederal regulations can have a preemptive effect equal to that of federal laws." *E.g.*, *Greenwich Ins. Co. v. Mississippi Windstorm Underwriting Ass'n*, 808 F.3d 652, 655 (5th Cir. 2015). "To find that a federal regulation preempts state law, we must be satisfied that such preemptive effect was both

intended and within the scope of the agency's delegated authority." *Id.* (internal quotation omitted).

The Fifth Circuit recognizes that

[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, a court must begin this inquiry into congressional intent with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*E.g.*, *Demahy v. Actavis, Inc.*, 593 F.3d 428, 434 (5th Cir. 2010), *rev'd sub nom. PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) (quoting *Wyeth*, 555 U.S. at 565). The "historic primacy of state regulation of health and safety" warrants "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation omitted).

In 1988, the LPLA was enacted to provides a legal remedy for people harmed by dangerous products. 1988 La. Acts No. 64 (enacting Chapter 3 of Code Title V of Code Book III of Title 9 of Louisiana Revised Statues sections 2800.51, *et seq.*). In 1996, with the LPLA and other states' products liability laws on the books, Congress enacted the TCA yet did not expressly preempt products liability claims. *See Cohen*, 46 F.4th at 1028; *Farina*, 625 F.3d at 120; *Murray*, 982 A.2d at 768; *Pinney*, 402 F.3d at 456. Congress did, however, include saving clauses in the FCA and TCA, which "indicate[s] Congress envisioned some role for state law in the [telecommunications] field." *Farina*, 625 F.3d at 121. "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless

decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth*, 555 U.S. at 575 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) (internal quotations omitted)). Congress was aware of the LPLA when it amended the FCA in 1993, and when it enacted the TCA in 1996, but chose not to expressly preempt state law tort claims related to cell phone RF radiation. *See Wyeth*, 555 U.S. at 565, 757. Absent "clear and manifest purpose of Congress," *Wyeth*, 555 U.S. at 565, the various Louisiana Revised Statutes and Louisiana Civil Code articles that regulate health and safety are entitled to a presumption against preemption. *See id*.

If congressional intent to preempt cannot be ascertained from the text of the FCA and TCA, the court must look to Congress's purposes and objectives in enacting the FCA and the TCA to determine whether state law would stand as obstacle to Congress achieving these goals. *See Aldridge*, 990 F.3d at 875. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *E.g.*, *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 528 (5th Cir. 2013). Congress's purposes and objectives in the FCA and TCA are intertwined with the FCC's authority to regulate cell phones, from which Defendants argue the conflict with Plaintiffs' claims arises. Doc. 67-1, p. 28. The Fifth Circuit, too, recognizes that the scope of the FCC's delegated authority is an important factor to determining whether the FCC SAR Standard preempts state tort law. See *Greenwich*, 808 F.3d at 655.

Defendants argue that in Sections 151 and 157(a) of the FCA "Congress directed the FCC to carefully weigh public-safety factors and promote efficiency." Doc. 67-1, p.

24. Defendants further contend that Congress granted the FCC authority to set RF emissions policy "by striking a balance between protecting public health and promoting efficient and comprehensive wireless services." Doc. 67-1, p. 11. And in passing the TCA, Defendants allege that Congress "emphasized the importance of nationwide uniformity in regulating emissions" and "directed the FCC to make a policy determination on the 'appropriate balance' between 'adequate safeguards of the public health' and 'speed[y] deployment . . . of competitive wireless telecommunications services.'" Doc. 67-1 (quoting Report by Mr. Bliley, House Committee on Commerce, H.R. Rep. No. 104-204, 94, 1996 U.S.C.C.A.N. 10, 61). From this congressional goal of balancing, Defendants claim the FCC's authority to regulate cell phones carries preemptive effect.

The FCC began regulating RF radiation in 1985 by adopting the 1982 ANSI guidelines for human exposure to RF electromagnetic radiation. *See* 100 F.C.C.2d at 552. When the FCC did this, Congress had not specifically authorized regulation of handheld mobile devices by the FCC. However, the FCA did grant the FCC broad regulatory authority including over "the kind of apparatus to be used with respect to its external effects and the purity and sharpness of its emissions." 47 U.S.C. § 303(e). It was the FCC's position in 1985 that it had "neither the expertise nor the jurisdiction to develop [its] own radiation exposure guidelines." 100 F.C.C.2d 543, 551 (1985). In Section 704(b) of the TCA, Congress gave the FCC authority to regulate cellphone by referencing the FCC's Docket[8] that considered adoption of the 1993 revised ANSI/IEEE RF radiation guidelines,

_____

[8] 8 F.C.C.R. at 2849-51.

which added new guidelines for cell phones. Pub. L. No. 104-104, § 704(b), 110 Stat. 152 (1996). The current 1.6 W/kg maximum SAR limitation was a direct product of Congress's directive to the FCC in Section 704(b). Accordingly, the RF regulations are within the scope of the agency's delegated authority. The next question, then, is whether they reflect sufficiently significant agency objectives such that Plaintiffs' claims stand as an obstacle to their accomplishment.

The FCC repeatedly disclaimed any expertise in health effects, as outlined *supra*. In 1997, however, after receiving notice and comment and adopting a third party's SAR Standard the FCC stated:

> We believe our decisions provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible.

12 F.C.C.R. 13496. And in 2008, participating as amicus curiae in *Murray*, the agency argued successfully that plaintiff's suit stood as an obstacle to the SAR Standard because those claims would require courts to make policy decisions regarding the appropriate technical standards for RF communications. Brief for the FCC as Amicus Curiae, pp. 9, 24, *Murray v. Motorola*, 982 A.2d 764 (2009).

In 2013, the FCC asserted that Section 704(b) of the TCA directed it to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions upon completing action in then-pending rulemaking proceeding." 28 F.C.C.R. at 3530–31 n.176 (internal quotations omitted). The FCC pointed out that the Third Circuit in *Farina* found that "FCC regulation of cell phone RF emissions — including those rules addressing

health effects — preempted state lawsuit dependent on claims of adverse health effects from FCC-compliant cell phone RF emissions [because] [p]rotecting public safety [with RF emissions regulation] [was] already within the FCC's mandate" in the FCA, 47 U.S.C. §§ 151, 332(a). 28 F.C.C.R. at 3530–31 n.176. To support its position that state suits are preempted, the FCC's 2013 Order cites *Farina*, which cites *Murray* for the proposition that state law claims would upset the balance. In sum, the FCC's current position is that in order to balance public health and safety with creating an efficient, uniform network, it has regulatory authority to preempt state law regarding the SAR Standard. *Id.*

In its 2019 reaffirmation of the SAR Standard, the FCC emphasized that under its standards "phones legally sold in the United States pose no health risks" and noted that claims challenging the adequacy of its certification regime were "no different than a challenge to the adequacy of the federal RF exposure limits themselves," with both types undermining the agency's "substantive policy determinations." 34 F.C.C.R. at 11696 & n. 49. In its amicus brief filed in the district court proceedings for *Cohen*, the FCC also offered its view of how claims attacking the certification process obstructed agency objectives. Doc. 67, att. 5. It asserted that plaintiffs' claims, based on third-party testing of Apple phones previously certified for sale by the FCC, raised "questions about the policy judgments that the FCC made in crafting its testing and certification procedures for authorizing the sale of cell phones in the United States." *Id.* at 5. The agency emphasized that the regulations mandate testing of the phones "by an FCC-recognized accredited testing laboratory and consistent with FCC specifications concerning the testing protocol." *Id.* at 9–10.

Like the Ninth and Third Circuits and the D.C. Court of Appeals, this court agrees that state law claims attacking the safety of the SAR Standard are preempted by federal law. Though the FCC disclaimed any expertise in health or safety, it set the SAR standard under a congressional mandate and in service of its broad statutory mandate to provide a uniform, efficient network. Likewise, the court finds that this objective extends to certifying cell phones for sale and ensuring manufacturers' general compliance with the SAR Standard. A patchwork of testing protocols would undermine the FCC's well-established objectives by creating confusion among manufacturers and either allowing potentially unsafe phones to pass into the marketplace or driving up costs for all manufacturers as they strive to avoid ever failing any third-party testing, no matter its ultimate reliability. Accordingly, claims that attack the adequacy of the FCC's certification procedures and testing protocols are preempted. But many of the claims here are potentially premised on the idea that, due to a manufacturing or design defect, specific phones used by Mr. Walker were emitting RF radiation above the SAR Standard.

Unlike the plaintiffs in *Cohen*, Plaintiffs here are not relying on third-party testing that implicitly challenges the adequacy of the FCC's certification regime.[9] And Defendants point to no regulations showing the FCC's oversight over individual manufacturing facilities. Especially in light of the saving clauses, the historical role of the states in health and safety, and the state products liability statutes in existence at the time the SAR Standard was adopted, the court cannot find manufacturing defect claims preempted to the extent an

---

[9] Indeed, from the complaint it is unclear how Plaintiffs came to their belief that the phones at issue exceed the SAR Standard or if they are even in possession of these phones. But the motion before the court is based on preemption rather than the adequacy of Plaintiffs' allegations.

individual phone might deviate from the federal standard due to some error by the manufacturer. Accordingly, only Plaintiffs' claims for failure to warn (Count II), concealment, misrepresentation, and fraud (Count III); civil conspiracy and concert of action (Count IV); and LUTPA violations (Count VI); as well as all claims against CTIA and TIA, are preempted because these are premised on general attacks on the inadequacy of the FCC's certifications and cell phone manufacturers' alleged manipulations of testing results. To prevail on the remaining claims, Plaintiffs will first have to prove that one or more of the phones at issue exceeded the SAR Standard under FCC testing protocols due to some defect caused by a defendant.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Dismiss [doc. 67] will be **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' claims under Counts II, III, IV, and VI, as well as all claims against CTIA and TIA will be **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Chambers on the 21st day of April, 2023.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**